Filed 2/5/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G052144 |
| v. | (Super. Ct. No. FVI1102631) |
| JERRY RAMIREZ AND CATHERINE RODRIGUEZ VILLARREAL, | O P I N I O N |
| Defendants and Appellants. | |


Appeal from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Reversed and remanded.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant, Jerry Ramirez.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant, Catherine Rodriguez Villarreal.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants Jerry Ramirez and Catherine Rodriguez Villarreal, respectively, of attempted murder and assault with a deadly weapon. But the jury found them both not guilty of active participation in the Sureños, an alleged criminal street gang, and the jury rejected gang sentencing enhancement allegations that the attempted murder and the assault were committed for the benefit of the Sureños.

In this appeal, defendants' primary complaint is that the trial court erroneously denied their motion to set aside the gang participation charges and the gang enhancement allegations under Penal Code section 995[1] (the 995 motion) and, as a result, irrelevant but highly inflammatory gang evidence was admitted which deprived them of their due process rights to a fair trial on the attempted murder and assault charges.

We conclude the preliminary hearing evidence did not support the gang participation charges or the gang enhancement allegations, so the 995 motion should have been granted. We also determine the gang evidence erroneously admitted at trial violated defendants' due process rights and resulted in a fundamentally unfair trial. Therefore, the judgment must be reversed. This disposition moots defendants' remaining contentions.

## FACTS AND PROCEDURAL HISTORY

In 2011, the Mendoza family, Andy, Natalie, David, Ernest, Irma, and their other siblings and mother, lived in a residence on Outer Hesperia Road in Victorville.[2] Villarreal lived a few doors down from the Mendozas on the same street. Apparently, the two families had lived peaceably for a long time. In fact, Villarreal had been one of Irma's childhood friends. Nevertheless on November 15, during a dispute between Villarreal and Natalie, Villarreal allegedly hit Natalie with a baseball bat, and Villarreal's boyfriend Ramirez admittedly shot Andy.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] We refer to the members of the Mendoza family by their first names for clarity and not out of any disrespect.

2

A complaint charged Ramirez and Villarreal with attempted, premeditated murder of Andy (§§ 187, 664, subd. (a)); Villarreal with assault with a deadly weapon on Natalie (§ 245, subd. (a)(1)); and both defendants with active participation in a criminal street gang (§ 186.22, subd. (a) (gang participation)). The complaint also alleged defendants committed the attempted murder and the assault for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1) (gang enhancement); § 12022.53, subd. (e)(1)), and alleged Ramirez personally discharged a firearm and caused great bodily injury (§ 12022.53, subds. (b), (c), (d) & (e)(1)).

At the preliminary hearing, two sheriff's deputies testified concerning statements made by Andy, Natalie, and Ernest. Andy told the deputies he had gone outside the family home to help Natalie, and Ramirez shot him in the face.

Natalie confirmed Andy's story. She said she had been talking on the phone in her bedroom when she heard a car horn outside. She walked outside to investigate and saw several people in front of her house, including Villarreal and Ramirez. An argument started and Villarreal came at her with a baseball bat. Natalie cried out for her family to help her and raised her arms to cover her face. Villarreal swung the bat and hit Natalie's left arm.

According to Natalie, when Andy came out of the house and confronted Ramirez, Ramirez pointed a gun at Andy's face and fired. Andy fell to the ground, and Ramirez and Villarreal and the other people with them got into several cars and fled. Natalie said there had been a long-term disagreement between Andy and Ramirez, but she did not specify a precipitating incident.

Ernest said he grabbed a baseball bat to defend his family, but he dropped the bat after he got outside and realized Andy had been shot. A bat was later found in Ernest's bedroom.

Sheriff's Deputy Tim Jackson testified as the prosecution's gang expert, as follows:

3

DIRECT EXAMINATION BY PROSECUTOR:

"Q. Good morning, Deputy.

"A. Good morning.

"Q. Are you familiar with the Surenos?

"A. Yes, ma'am.

"Q. How are you familiar with him?

"A. The Surenos are a criminal street gang . . . based in the southern half of California. Every Hispanic gang member that resides south of Bakersfield is affiliated with the Surenos. The Surenos were created by the Mexican Mafia, who are the largest and most powerful prison gang in our country. The Surenos are the foot soldiers, if you will, for the Mexican Mafia to carry out their dirty work due to the criming, taxing, assaults, murders, all those things. There's only one gang south of Bakersfield that has not aligned itself with being a Sureno or the Mexican Mafia . . . .

"Q. Have you personally contacted Sureno members?

"A. Yes.

"Q. Approximately how many?

"A. Between the jail, custody settings, and patrol, over 100.

"Q. Do the Surenos have any rivals?

"A. Yes, the Nortenos.

"Q. And what, if any, symbols do the Surenos use?

"A. They utilize the number 13. It represents the Mexican Mafia. They utilize the color blue. They utilize the word Sur or Sureno to represent themselves.

"Q. And can you briefly describe the Surenos' territory?

4

"A.  As I stated before, the Surenos claim everything south of Bakersfield in California.

"Q.  Based on your background, training and experience, do the Surenos have a primary purpose of committing offenses?

"A.  Yes.

"Q.  And has this gang established a pattern of criminal activity?

"A.  Yes.

"Q.  What types of crimes?

"A.  Anything from violent crimes against a person to narcotics sales distribution, robberies, burglaries, auto theft.

"Q.  Are you familiar with a person by the name of Toby Stahlberg?  And that's spelled S-t-a-h-l-b-e-r-g, with a date of birth of January 19, 1979?

"A.  Yes.

"Q.  Do you have an opinion as to whether or not he is a member of the Surenos?

"A.  Yes, I do.

"Q.  What is that?  What's the basis of that opinion?

"A.  Mr. Stahlberg is a self-admitted member of the Eastside Rivas criminal street gang, who align themselves with the Surenos and Mexican Mafia.  His moniker is Traveiso, which stands for 'trouble.'  He has probably a rough estimate 20 or so tattoos indicative of his gang membership.

"Q.  And do you have an opinion as to whether or not he's a member of the Surenos?

"A.  Yes, I do.

5

"Q. What is that opinion?

"A. He is.

"Q. Are you familiar with Mr. Stahlberg's conviction of a violation of [former] Penal Code Section 12021 and 186[.]22 in Court Case FVI1001976 with a date of incident on August 27th, 2010?

"A. Yes, ma'am.

"Q. Are you familiar with a person by the name of Alfonso Coronado with a date of birth of July 6, 1983?

"A. Yes.

"Q. And how are you familiar with him?

"A. Alfonso Pancho Coronado is a member of the Eastside Victoria criminal street gang, who also align themselves with the Surenos.

"Q. Do you have an opinion as to whether or not Mr. Coronado is a member of Sureno?

"A. Yes, I do.

"Q. And what is that opinion?

"A. He is.

"Q. Are you familiar with Mr. Coronado's conviction under Penal Code Section 11378 and 186[.]22 in Court Case FVI1100791 with a date of incident on March 30th, 2011?

"A. Yes.

"Q. Are you familiar with the defendant Mr. Jerry Ramirez?

"A. Yes.

"Q. Do you see him in the courtroom today?

"A. Yes, I do.

"Q. During your investigation did you familiarize yourself with any of the defendant's tattoos?

"A. Yes, I did.

"Q. Based on your background, training and experience, were any of his tattoos significant to you?

"A. Yes.

"Q. Which ones?

"A. Mr. Ramirez has several tattoos that are significant to gang lifestyle due to the fact they're not considered body art. They're not recognized by the general public as art or recognized by the gang community. Mr. Ramirez has three dots on his right arm, which is utilized by the gang community standing for 'My Crazy Life' or 'Mi Vida Loca.' He also has a modified Aztec calendar on his left forearm. It's incomplete, but it contains the basics, if you will, of the calendar. Aztec art is commonly used by the Mexican Mafia and Surenos to discreetly represent gang affiliation. He also has an Aztec war shield on his right shoulder. The Aztec war shield is generally awarded to a Sureno after they've committed some type of crime being violent for the Mexican Mafia. It also is somewhat distorted. I would have to say that the tattoo artist in that case probably didn't know exactly what he was trying to put on. But it has all the basics, the three steps to make up the fundamentals of the tattoo with the three steps of the Aztec warrior.

"He's also got an Aztec temple on his ribcage area. Just above the temple there's an angel that has coincidently 13 wings, which is indicative of Mexican Mafia membership. He's got a star on the right ribcage area as well. It's along with the other tattoos in that area. And it's a southern star which technically does not exist. The southerners have created a specific southern star to combat the northern star from Norteno. They'll change the number points on the star and denote an S on the bottom, which Mr. Ramirez has.

7

"Q. Thank you. Now, based on your background, your training and experience, do you have an opinion as to whether or not the defendant Ramirez is an active Sureno member?

"A. Yes, I do.

"Q. What is that opinion?

"A. Based on the fact that he has tattoos, although discreet, they are consistent with membership in a Sureno criminal street gang. He also has a photograph that I was able to locate via his Facebook where he's wearing all blue, which is, again, a color that aligns with Mexican Mafia and the Surenos.

"Q. And based on your background, training and experience, and the fact that you sat through this preliminary hearing, do you have an opinion as to whether or not these crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang for the specific purposes of promoting, furthering, or assisting in criminal conduct by its members?

"A. Yes, I do.

"Q. What is that opinion?

"A. This alleged crime benefits the Surenos. The more violent crime Sureno gang members are willing to commit, the larger their reputation will grow. In gang subculture, violent crimes are revered and encouraged when compared to the general public they would be frowned upon. This reputation increases intimidation that the gang is able to employ over other people, the general public, other gangs, and even to law enforcement. If a gang or a gang member has such a large reputation as being willing to commit a violent crime such as shooting somebody in the face, there's a very good chance that nobody is going to report this person, try to contact this person, and stop him from committing any criminal activity.

"Q. And you spoke a little bit about reputation. Is that how the defendant personally benefits within the gang?

8

"A. Yes.

"Q. And specifically in regards to . . . Villarreal, now in your opinion is she an associate of the Surenos?

"A. Yes.

"Q. What do you base that opinion on?

"A. She is obviously boyfriend and girlfriend with the person I believe to be a Sureno. Mr. Ramirez also has a tattoo of the word 'Flaca' on his left ribcage area, and I believe that to be Ms. Villarreal's moniker.

"Q. And in what way do her actions benefit the gang?

"A. By supporting the activities of the defendant."

CROSS EXAMINATION BY RAMIREZ'S COUNSEL

"Q. Good morning, sir.

"A. Good morning

"Q. Just so we're on the same page, your determination of Mr. Ramirez' active gang affiliation with Sureno is based entirely on the artwork on his body; is that right?

"A. Yes, sir. Unfortunately Mr. Ramirez declined to speak to us during interview and - - he was being quite discreet with gang affiliation, has not admitted during classification or any other situation.

"Q. Okay.

"A. - - and

"Q. All right. People who admit during classification are put in places where they're going to be safe and other people are going to be safe from them while they're housed in jail.

"Is that a fair statement?

9

"A. Correct.

"Q. Okay. Mr. Ramirez declined to adopt any involvement in any gang affiliation. Isn't that true?

"A. Correct.

"Q. And do you know what a gang card is?

"A. Yes, sir.

"Q. You have no gang card on Mr. Ramirez. Isn't this true?

"A. No. sir.

"Q. There's no record of any contact with Mr. Ramirez regarding any felony at all. Isn't that true?

"A. Regarding any felony?

"Q. Yes.

"A. That I'm not sure of.

"Q. On Mr. Ramirez the typical tattoos that would evidence someone being a member of Sureno would be the number 13.

"A. Yes, sir.

"Q. That's not on Mr. Ramirez, is it?

"A. In the form of 13 feathers on his ribcage, yes.

"Q. So 13 feathers on what? A head dress?

"A. I believe it's angel's wings.

"Q. So 13 feathers on angel's wings equates to the number 13 as far as Sureno is concerned?

"A. Yes, sir. . . . gang members are becoming savvy to the gang enhancements. So they're much more discreet with tattoos . . . when they are contacted on the street . . . .

10

"Q. So you think based on your expertise and no prior contacts or no history you believe based on your expertise that the tattoos on Mr. Ramirez were not just done at a tattoo shop by somebody who does tattoos, but were done such that they are not recognized by the general community as artwork?

"[PROSECUTOR]: Objection. Vague. Speculation,

"THE COURT: You may answer the question, if you know.

"THE WITNESS: One tattoo that is coincidentally related to the Surenos - - or two tattoos that are coincidentally related I could say that possible not a gang member. With the large amount of tattoos that [Ramirez] has, all of which coincidentally are related, that's how I decided they were not body art.

"Q. He doesn't have the work 'Sur' on him anywhere, S-u-r for Sureno?

"A. No, sir.

"Q. And within the general guise of the Surenos, meaning the southerners, within the southerners there are subsets such as Eastside Riva; is that correct?

"A. Correct.

"Q. There's no connection that you know to Mr. Villarreal (sic) with any subset of any kind?

"A. I was unable to identify any subset he may be related to."

At the end of the preliminary hearing, both defense attorneys argued the gang evidence was insufficient to support the gang participation charges and the gang enhancements. The magistrate agreed the gang evidence was "unusual" but found, "for the standard of preliminary hearing I have a reasonable suspicion to believe that the crimes charged were committed and the defendants have committed them."

11

Thereafter the prosecutor filed an information with the same charges and enhancements as the complaint, including the gang participation charges and the gang enhancement allegations. Ramirez then filed the 995 motion to set aside the information on the grounds he was committed without probable cause.

The 995 motion asserted the preliminary hearing evidence was insufficient to support the gang enhancement allegations under section 186.22, subdivision (b)(1)(C), and it argued the gang participation charges under section 186.22, subdivision (a) (section 186.22(a)), required more than nominal or passive involvement in a criminal street gang.

The prosecutor filed opposition to the 995 motion which emphasized the minimal evidentiary showing required at a preliminary hearing, and argued Jackson's testimony that Ramirez was a Sureño and that he committed the alleged crimes to benefit the Sureños was enough to support the gang enhancement allegations.

At the hearing, the judge granted Villarreal's request to join in the 995 motion. Counsel mostly submitted on their written arguments. However, Ramirez's counsel also argued his tattoos were insufficient to support Jackson's opinion that he was a member of the Sureños, and Villarreal's counsel argued her gang liability was entirely derivative of Ramirez's alleged membership.

At the conclusion of the hearing on the 995 motion the judge stated: "To me, it's a close call. [¶] But I'm not here to re-weigh the evidence. I'm here to determine whether or not [the magistrate] could reasonably have evaluated this evidence and come up with the strong suspicion necessary to hold . . . your clients . . . to answer for the gang allegation. [¶] And I certainly do not believe it was unreasonable for him to make that call. I don't believe it was unsupported by the evidence. And I don't find – There is a substantial basis for his holding order, and so I am going to deny the motions."

After the judge denied the 995 motion, the case proceeded to trial on all of the charges and enhancements contained in the information, including the gang participation charges and the gang enhancement allegations.

12

## DISCUSSION

### 1. Denial of 995 Motion

Defendants contend the judge erroneously denied their 995 motion because the preliminary hearing evidence was insufficient to support the gang participation charges and the gang enhancement allegations in the information.[3]  We agree.

#### A. General Principles and Standard of Review

The function of the magistrate at a preliminary hearing is to determine whether there is "sufficient cause" to believe defendant is guilty of the charged offense. (§§ 871, 872.)  "'[S]ufficient cause'" equates to "'reasonable and probable cause'" or "a state of facts as would lead a [person] of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666-667.)

"'The purpose of a motion to set aside the accusatory pleading under section 995 is to review the sufficiency of the indictment or information on the basis of the record made before the grand jury in the one case or the magistrate at the preliminary hearing in the other.'" (*Stanton v. Superior Court* (1987) 193 Cal.App.3d 265, 269.) "''"An information will not be set aside . . . if there is some rational ground for assuming the *possibility* that an offense has been committed and the accused is guilty of it."' [Citation.]" (*People v. Arjon* (2004) 119 Cal.App.4th 185, 193 (*Arjon*).)

On appeal following the denial of a 995 motion, we review the preliminary hearing magistrate's determination directly and disregard the judge's 995 ruling. (*People v. Bautista* (2014) 223 Cal.App.4th 1096, 1101.)

---

[3]  Villarreal's appellate counsel filed a brief pursuant to *Anders v. California* (1967) 386 U.S. 738, 744 and *People v. Wende* (1979) 25 Cal.3d 436, and the only potential issue she identified is whether a bat is a deadly weapon.  She did not join in Ramirez's brief.  Nevertheless, for the reasons set forth below, we conclude both Villarreal's and Ramirez's due process rights to a fundamentally fair trial were compromised.  Therefore, the judgment must be reversed as to both defendants.

*B. Criminal Street Gang – Section 186.22, Subdivision (f)*

Defendants argue the evidence adduced at the preliminary hearing was insufficient to support the prosecution's contention that the Sureños are a single "criminal street gang" within the meaning of section 186.22, subdivision (f) (section 186.22(f)). We find this argument is persuasive, for reasons which we will explain.

To prove the existence of a criminal street gang, the prosecution is required to demonstrate the alleged gang satisfies the separate elements of the definition set out in section 186.22 (f), which provides the term "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subds. (a) & (b); *People v. Prunty* (2015) 62 Cal.4th 59, 67, 71-76 (*Prunty*).)

"[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 71.) "Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b). But it is not enough . . . that the group simply shares a common name, common identifying symbols, and a common enemy. Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Id*. at p. 72, fn. omitted.)

14

Reviewing the preliminary hearing evidence in light of the framework our Supreme Court set forth in *Prunty*, it is apparent the prosecution failed to adequately show the Sureños are a single criminal street gang under section 186.22(f). The prosecution's theory underlying the gang participation charges and the gang enhancement allegations was that defendants actively participated in and committed the attempted murder and the assault for the benefit of the Sureños. Therefore, "the prosecution needed to show that the same group engaged in illicit primary activities, and committed the predicate offenses." (*Prunty*, *supra*, 62 Cal.4th at p. 82.)

The preliminary hearing evidence as to the primary activities requirement was likely sufficient. Jackson testified the Sureños engage in "[a]nything from violent crimes against a person to narcotics sales distribution, robberies, burglaries, auto theft."

But the preliminary hearing evidence as to the predicate offenses requirement fell short. Jackson referred to two predicate offenses involving two alleged Sureño subsets: prohibited possession of a firearm by Stahlberg, a self-admitted member of the Eastside Rivas gang; and possession of a controlled substance for sale by Coronado, a member of the Eastside Victoria gang, according to Jackson.

Although Jackson testified the Eastside Rivas and Eastside Victoria gangs "align themselves with the Sureños," he otherwise provided no evidence that could connect these gangs to one another, or to an overarching Sureño criminal street gang. Jackson did not describe any evidence tending to show collaboration, association, direct contact, or any other relationship between the Eastside Rivas and Eastside Victoria.

Moreover, Jackson's testimony did not indicate the Eastside Rivas and Eastside Victoria gangs shared information, defended the same claimed turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that would permit the inference of an associational or organizational connection among them. Nor did his testimony demonstrate the Eastside Rivas and Eastside Victoria, or any of their members, self-identified as members of the larger Sureño association.

15

Jackson did testify about the Sureños existence "in the southern half of California." Jackson also claimed, "Every Hispanic gang member that resides south of Bakersfield is affiliated with the Surenos." But Jackson never addressed the Sureño gang's relationship to the Eastside Rivas or Eastside Victoria gangs specifically. And in describing the Eastside Rivas and Eastside Victoria, Jackson offered no evidence any of their members behaved in a manner that conveyed their identification with the Sureños.

Instead, Jackson simply described the Eastside Rivas and Eastside Victoria gangs by name, characterized them as aligned with the Sureños, and testified as to the alleged predicate offenses. He offered no additional information about the Eastside Rivas and Eastside Victoria members' behavior or practices that could reasonably lead the magistrate to conclude they shared an identity with the Sureños. So the magistrate had no way to connect the gangs that committed the predicate offenses to the larger Sureños.

Jackson also testified: "The Surenos were created by the Mexican Mafia, who are the largest and most powerful prison gang in our country. The Surenos are the foot soldiers, if you will, for the Mexican Mafia to carry out their dirty work due to the criming, taxing assaults, murders, all those things." While this evidence might permit the inference that various alleged gang subsets share a common origin, it does not indicate whether the Eastside Rivas and Eastside Victoria gangs, the specific alleged subsets involved in committing the predicate offenses, have any ongoing relationship (the kind of relationship that amounts to being part of the same group) with the Sureños.

Jackson claimed the Sureños "utilize the number 13," which "represents the Mexican Mafia," they "utilize the color blue" and "the word Sur or Sureno to represent themselves," and their rivals are the Norteños. But this evidence does not show the Eastside Rivas and Eastside Victoria gangs "are united together or with a larger group as a single 'organization, association, or group,' as we have explained above." (*Prunty*, *supra*, 62 Cal.4th at pp. 83-84.) And none of Jackson's testimony addressed whether the Eastside Rivas and Eastside Victoria gangs even exhibited these common characteristics.

16

Finally, Jackson's opinion the Sureños are a criminal street gang is "purely conclusory and essentially of no use to the fact finder. [Citation.]" (*Prunty*, *supra*, 62 Cal.4th at p. 85.) Jackson did not describe any facts tending to show an organizational or associational connection among the Eastside Rivas and Eastside Victoria gangs, nor did he articulate any reasons for concluding these gangs are part of a single larger criminal street gang. He also did not describe any material he relied on in reaching his opinion on this point. So his opinion that the Sureños are a criminal street gang had no value, and the magistrate could not rely on it to find the existence of a criminal street gang. (*Ibid*.)

In sum, the evidence was insufficient to support the inference the Sureños are a single criminal street gang under 186.22(f). The critical shortcoming was the lack of an associational or organizational connection between the alleged Sureño subsets that committed the predicate offenses, the Eastside Rivas and Eastside Victoria gangs, and the larger gang that defendants allegedly actively participated in and sought to benefit, the Sureños. The absence of this necessary connection is fatal to the gang participation charges and the gang enhancement allegations. (*Prunty*, *supra*, 62 Cal.4th at p. 84.)

*C. Gang Participation Charges – Section 186.22, Subdivision (a)*

Even assuming for the sake of argument the preliminary hearing evidence was sufficient to show the Sureños are a single criminal street gang for purposes of section 186.22(f), it was not sufficient to support the magistrate's determination on the gang participation charges under section 186.22(a).

"The elements of the gang participation offenses in section 186.22(a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) The deficiencies in the preliminary hearing evidence in this case concern all three elements.

17

With respect to the first element, defendants correctly observe there was insufficient evidence that their alleged participation in the Sureños was anything more than nominal or passive.[4] Jackson did opine Ramirez is "an active Sureno member," and Villarreal is "an associate of the Surenos." But an expert's opinion "'is no better than the facts on which it is based.'" (*People v. Gardely* (1996) 14 Cal.4th 605, 618.)

The only facts linking Ramirez to the Sureños were his tattoos and his Facebook photo, "where he's wearing all blue . . . ." Moreover, the only facts linking Villarreal to the Sureños were her romantic relationship with Ramirez, and the "Flaca" tattoo on his ribcage, which is supposedly her gang moniker.

These facts are insufficient to support an inference that defendants' alleged participation in the Sureños was anything more than nominal or passive. Once more, Jackson's opinions to the contrary are "purely conclusory and essentially of no use to the fact finder. [Citation.]" (*Prunty*, *supra*, 62 Cal.4th at p. 85.)

With respect to the second element, the preliminary hearing evidence is also insufficient to support an inference defendants had knowledge that Sureños members "engage in or have engaged in a pattern of criminal gang activity." (§ 186.22(a); *Rodriguez*, *supra*, 55 Cal.4th at p. 1130.) In fact, there is insufficient evidence in the record from which the magistrate could infer that defendants had any knowledge at all about the activities of the Sureños.

---

[4] The Attorney General asserts defendants forfeited any challenge to the gang participation charges by not including them in the 995 motion. The Attorney General is mistaken. As noted above, the 995 motion argued active participation under section 186.22(a) required more than nominal or passive involvement in a criminal street gang. Specifically, the 995 motion observed that the United States Supreme Court in *Scales v. United States* (1961) 367 U.S. 203, 223 stated '"the distinction between 'active' and 'nominal' membership is well understood in common parlance."' In any event, as we will explain, the judge's erroneous denial of the 995 motion implicates both defendants' substantial rights.

18

With respect to the third element of the charges under section 186.22(a), the prosecution must show the alleged gang participant committed "an underlying felony *with at least one other gang member*." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1134, italics added.) "Although the People might prefer a different statute, section 186.22(a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." (*Id*. at p. 1139.)

While the evidence as to Ramirez's alleged membership in the Sureños was likely sufficient for preliminary hearing purposes, the evidence as to Villarreal's alleged membership was not. Jackson only opined she was an associate, not a member. And that opinion was based solely on her relationship with Ramirez and the tattoo on his ribcage. Jackson basically inferred Villarreal was an associate, because Ramirez was a member. But these facts do not support an inference Villarreal was a member of the Sureños.

Also, while Natalie told the deputies she saw several people in front of her house with defendants, the prosecution presented no evidence that any of those people were Sureños members. So it appears only one Sureño member was involved, at most.

Hence, the preliminary hearing evidence was insufficient to support the section 186.22(a) gang participation charges. There was no """"rational ground for assuming the *possibility* that""" the gang participation offenses has been committed, and that defendants were """"guilty of it.""" (*Arjon*, *supra*, 119 Cal.App.4th at p. 193.)

*D. Gang Enhancement Allegations – Section 186.22, Subdivision (b)(1)*

Again assuming the Sureños are a criminal street gang, the preliminary hearing evidence was also insufficient to support the gang enhancement allegations under section 186.22, subdivision (b)(1) (section 186.22(b)(1)). Here, "the prosecution must prove that the underlying crime was 'committed for the benefit of, at the direction of, or in association with any criminal street gang' (the gang-related prong), 'with the specific intent to promote, further, or assist in any criminal conduct by gang members' (the specific intent prong). [Citations.]" (*People v. Rios* (2013) 222 Cal.App.4th 542, 564.)

19

The deficiencies in the preliminary hearing evidence in this case concern both prongs.  As to the gang-related prong, Jackson opined the attempted murder and the assault benefitted the Sureños.  He said, "The more violent crime Surenos gang members are willing to commit, the larger their reputation will grow.  In gang subculture, violent crimes are revered and encouraged when compared to the general public they would be frowned upon.  This reputation increases intimidation that the gang is able to employ over other people, the general public, other gangs, and even to law enforcement."

In essence, Jackson opined that all violent crimes committed by Sureño members benefit the Sureños because they increase the Sureños' reputation.  Of course, "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1).  [Citations.]"  (*People v. Albillar* (2010) 51 Cal.4th 47, 63 (*Albillar*).)

But in this case, Jackson's benefit opinion proves too much.  Assume hypothetically Ramirez was a member of the Eastside Victoria gang and Andy was a member of the Eastside Rivas gang.  Next, recall Jackson opined, "Every Hispanic gang member that resides south of Bakersfield is affiliated with the Surenos."  Then, according to Jackson's opinion, when Ramirez shot Andy, the Sureños' reputation was enhanced.  In other words, according to Jackson, the Sureños gang as a whole benefits when one Sureño member shoots another Sureño member.  This obviously makes no sense.

Further, no other preliminary hearing evidence supports an inference the attempted murder of Andy or the assault on Natalie was gang related.  For example, no gang signs were flashed, no gang names were called out, and no gang attire was worn.  Plus, while there is some evidence Ramirez actually is a gang member and Villarreal might be a gang sympathizer, there is no evidence Andy or Natalie are gang members.  Likewise, there is no evidence the disputes between Andy and Natalie on the one hand, and Ramirez and Villarreal on the other, had anything to do with any gang.

20

Regarding the specific intent prong, when the "evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) In this case, even if the evidence establishes that defendants intended to attack Natalie and Andy together, and that they assisted each other in doing so, as noted, there was insufficient evidence to show they were both known members of the Sureños. Thus, there is insufficient evidence defendants had the required specific intent.

In short, there was no preliminary hearing evidence apart from Jackson's purely conclusory and factually unsupported opinions that the attempted murder and the assault were committed for the benefit of, at the direction of, or in association with the Sureños, and with the specific intent to promote, further, or assist in any criminal conduct by Sureño members. Consequently, the preliminary hearing evidence was insufficient to support the section 186.22(b)(1) gang enhancement allegations in this case.

*2. Prejudice at Trial*

Having concluded the judge erroneously denied the 995 motion because the preliminary hearing evidence was insufficient to support the gang participation charges and the gang enhancement allegations, we must next determine if that error prejudiced defendants at trial. (*People v. Crittenden* (1994) 9 Cal.4th 83, 136-137.)

After the 995 motion was denied, the case proceeded to trial on all of the charges and enhancements contained in the information, including the gang participation charges and the gang enhancements. As a direct result, prejudicial gang evidence, which was irrelevant to the attempted murder and assault charges, was erroneously admitted at trial. Still, the erroneous admission of the gang evidence does not require reversal unless it is reasonably probable defendants would have achieved a more favorable result on the attempted murder and assault charges had the gang evidence been excluded. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Watson* (1956) 46 Cal.2d 818.)

21

At trial Andy, Natalie, Ernest and David all testified about the incident. They heard a car horn, and David went outside to investigate. He found Ramirez and Villarreal in an SUV. David asked Ramirez what he was doing, and Ramirez laughed and said, "Where's your brother?" David told Ramirez his brother was inside, and he threatened to "get" Ramirez for honking his horn.

Natalie went to the front door. She saw Villarreal standing in front of the door, holding a baseball bat. There were three girls behind Villarreal, and three cars with "people in them" parked on the street. Ramirez was in an SUV, and two or three other men were standing nearby.

Natalie walked about 10 steps outside of her house and told Villarreal "she was a scary bitch because she brung (sic) a bat." Villarreal charged at Natalie, swung her bat, and hit Natalie's left arm. Villarreal was about to hit Natalie again when Andy, David, and Ernie ran outside.

Andy saw Villarreal hitting Natalie with a baseball bat. He yelled "stop," and Villarreal backed away. Ramirez walked up and said something like, "What's up fool?" Andy then saw Ramirez lift his arm. There was a flash, a hard blow to the face, and then Andy blacked out.

After Andy was shot, Ernie grabbed a baseball bat and raised it over his head in an apparent attempt to hit Ramirez. But Andy told him to stop. Ernest denied threatening or hitting anyone with the bat. He said he picked up the bat because he thought Ramirez and Villarreal were going to escape.

Ramirez also testified about the incident. Ramirez went to Villarreal's home after work that night. She told him she was having a fight with her neighbor, Natalie, on Facebook. Ramirez acknowledged he and Andy had been involved in a "prior incident," and said he and Villarreal drove over to the Mendoza's home to find out "what was going on or try to fix the situation." He only intended to talk to Andy, but admitted he kept a handgun in his car "[f]or protection."

22

When they arrived at the Mendoza's home, Ramirez honked his horn and waited for someone to come outside. David came out of the house, and asked Ramirez, "What's the problem?" Ramirez said he needed to talk to Andy and David went back inside the home.

Ramirez said that when David came back outside, he brought all of his brothers with him and Andy had a baseball bat in his hands. The Mendoza brothers advanced en masse toward Ramirez. Ramirez stepped back, opened his car door, and retrieved his gun out of the door panel. Andy cocked the bat over his head and walked toward Villarreal. Andy gave the bat a half swing and narrowly missed Villarreal's head. When Andy swung at Villarreal a second time, Ramirez, who was about three to five feet away, fired one shot and hit Andy's face. Ramirez said he fired because he thought Andy was going to hit Villarreal in the head with the bat.

Thus, conflicting trial testimony about the incident presented the jury with two plausible factual scenarios. On one hand, the Mendozas testified Villarreal confronted Natalie and hit Natalie with a baseball bat, and Ramirez shot Andy when Andy tried to intervene. On the other hand, Ramirez testified Andy came at Villarreal with a baseball bat, and Ramirez shot Andy in defense of Villarreal and himself.

So the jury's evaluation of Ramirez's credibility was critical. But there is a substantial likelihood the jury's evaluation of his credibility was colored by the gang evidence admitted at trial. Jackson again testified as a gang expert, and repeated most of his preliminary hearing testimony, but with more detail. He testified at length about the origins and activities of the Mexican Mafia and the Sureños, and their rivalry with the Norteños. He said the Sureños are foot soldiers for the Mexican Mafia, and have "committed everything from attempted murder, robbery, extortion, narcotics, trafficking, narcotic sales, possession of firearms, possession of loaded firearms, kidnapping, false imprisonment, grand theft auto, basically any crime."

Jackson opined Ramirez was an active participant in the Sureños, based upon his tattoos, his alleged moniker "Knuckles," and his brothers' documented gang memberships.  Jackson opined Villarreal was a Sureños associate, "Based on the fact that she has a moniker of Fla[c]a . . . .  And the fact that she was willing to participate in a brazen international [*sic*] crime . . . ."

Jackson testified the crimes benefitted the Sureños.  He said "[t]he fact that the defendants carried out a crime that was this brazen . . . , ruthless, irrational . . . .  Those things bolster street reputation.  They bolster reputation of the gang members.  They bolster the reputation of the gang.  That reputation gets gangsters, gangs what they want.  [¶] They want that fear in the community . . . ."

None of this gang evidence was relevant to the attempted murder and assault charges, but its potential prejudicial effect upon them was manifest.  "California courts have long recognized the potentially prejudicial effect of gang membership. . . .  'It is fair to say that when the word 'gang' is used . . . , one does not have visions of the characters from 'Our Little Gang' series.  The word "gang". . . connotes opprobrious implications. . . .  [T]he word "gang" takes on a sinister meaning when it is associated with activities.'  [Citation.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223)  It also tended to impermissibly show defendants' bad character as a means of creating an inference they committed these charged offenses.  (Evid. Code, § 1101, subd. (a).)

Under these circumstances, there is a reasonable probability defendants would have achieved a more favorable result on the attempted murder and assault charges if the 995 motion had been granted and the gang evidence had been excluded.  For these reasons we conclude the court's erroneous denial of the 995 motion resulted in a miscarriage of justice (Evid. Code, § 353) and violated both defendants' state and federal constitutional due process rights to a fundamentally fair trial.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439, 435.)  Accordingly, the judgment must be reversed.

24

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial or other disposition of the attempted murder and assault charges and the firearm and great bodily injury enhancement allegations.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

25