Filed 7/19/16  P. v. Grant CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY MICHAEL GRANT,<br><br>    Defendant and Appellant. | B264820<br><br>(Los Angeles County<br>Super. Ct. No. BA428350) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed as modified.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found appellant Anthony Grant guilty of first degree murder, with findings that he personally discharged a firearm causing great bodily injury and death, and committed the murder for the benefit of a criminal street gang. (Pen. Code, §§ 187, subd. (a); 12022.53, subd. (d); 186.22, subd. (b)(1)(C).)[1] Grant admitted a prior strike conviction, a prior serious felony conviction, and prior conviction with a prison term. (§§ 667.5, subds. (b)-(i); 1170.12, subds. (a)-(d); 667, subd. (a); 667.5, subd. (b).) The trial court sentenced Grant to an aggregate term of 80 years to life in state prison. Grant argues the gang finding is not supported by substantial evidence, and that various evidentiary and instructional errors warrant reversal of his murder conviction. We reverse as the gang enhancement, but otherwise affirm the judgment.

## FACTS

### *The Murder and Investigation*

Matthew Sims (the murder victim) and Grant were both members of the 7-4 clique of the Hoovers criminal street gang. On April 9, 2014, at some time around 3:45 or 4:45 in the afternoon, Sims went to Erick Washington's house to talk about an incident between Sims and Grant. At the time, Washington also was a member of the 7-4 Hoovers clique.[2] Sims seemed "antsy." He said that he and Grant "got into it" in the backyard at Grant's house, and that they had "squared off" to fight. Sims said that as he and Grant did so, several "little homies" surrounded Sims. Sims put his hand on a screwdriver in his pocket and told Grant to meet him at the "donut," an area on 80th Street between Hoover Street and Figueroa Street known for fighting. Sims said he had walked to the donut, but Grant did not show up. Sims had then walked directly to Washington's house on 81st Street. After describing the incident with Grant, Sims asked Washington if he would talk to Grant. Washington said that he would, but he had a prior family obligation first. After talking to Washington, Sims left.

---

[1]    All further undesignated section references are to the Penal Code.

[2]    By the time of trial, Washington was trying to distance himself from the gang culture and was cooperating with police authorities in connection with gang criminal activities.

2

On April 9, 2014, at approximately 7:50 p.m., Los Angeles Police Department (LAPD) Officer Craig Stogel and his partner received a radio call about a report of a "man down on the sidewalk." In response to the call, the officers drove to the area of 76th Street and Figueroa Street. When the officers arrived at the scene, Officer Stogel saw Sims lying on the ground. He was bleeding and appeared to have been shot multiple times, including a gunshot wound to his head. Officer Stogel and his partner searched the area for evidence, and found several expended .45 caliber bullets and bullet shell casings in a nearby alley. Subsequent ballistics examination established that the casings and bullets were all fired from the same gun, and that they were "most likely" fired from a rifle.

LAPD Detective Michael Levant and his partner also responded to the area of the shooting on August 9, 2014. Detective Levant and his partner recovered date and time-stamped surveillance videos from two cameras located at the rear of a residence on 76th Street, facing an alley. One of the cameras looked west toward Hoover Street, the other camera looked east toward Figueroa Street.

One video showed three individuals walking east toward Figueroa Street. In a jail telephone call after he was arrested, Grant admitted he was depicted in the video. At trial, Erick Washington identified Grant as the man in the video who was wearing orange shorts. A second video showed Grant going back down the alley, heading in the direction of his home. A third video showed Grant riding a bicycle, heading eastbound. It appeared that Grant had a rifle, wrapped in clothing, on the handlebars of the bicycle. The video showed Grant riding his bicycle back through the alley a few minutes later. A later video showed a male walking down the alley. The male threw an unknown object onto the roof of a residence. Detective Levant went onto the roof where the unknown object had been thrown, and recovered a pair of orange cargo shorts. Subsequent laboratory tests established that Grant's DNA was on the shorts. Further, the tests established that there was gunshot residue on the front of the shorts.

3

*The Criminal Case*

In February 2015, the People filed an information charging Grant with murder (§ 187, subd. (a)), with an allegation that he personally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). Further, the information alleged that Grant committed the murder for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) The case was tried to a jury in May 2015, at which time the prosecution presented evidence establishing the facts summarized above. The prosecution also presented the testimony of a gang expert.

Grant did not present any evidence in his defense. His trial counsel argued to the jury: "We know that Mr. Grant fired the rifle that killed Mr. Sims. . . . Why did this happen? [¶] You must find Mr. Grant not guilty [of any crime] in the case because the evidence you heard points toward self-defense." In making this argument, Grant's trial counsel noted that Sims was shot near Grant's house. Counsel argued that the evidence showed Sims had a confrontation with Grant during which Sims went to use a deadly weapon -- the screwdriver in his pocket. Sims had then gone to the donut to fight Grant, but Grant did not show. Counsel argued that it could be reasonably inferred that Sims had then gone looking for Grant in the area around his home. Counsel proffered that all of the parties involved in the events were not "boy scouts," but hardened gang members, and that Grant had reasonable grounds for fearing for his life from Sims.

The case was submitted to the jury on instructions on first degree premeditated murder, second degree murder, and voluntary manslaughter based on "imperfect self-defense," and the self-defense. On May 28, 2015, the jury returned a verdict finding Grant guilty of first degree murder, with a finding that he personally discharged a firearm causing great bodily injury and death. Further, that he had committed the murder for the benefit of a criminal street gang.

Grant thereafter admitted he suffered a prior conviction for manslaughter (§ 192) which qualified as a strike, a prior serious or violent conviction, and a conviction with a prison term. (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d); 667, subd. (a); 667.5, subd. (b).) The trial court sentenced Grant to a total aggregate term of 80 years in state prison

4

as follows: an indeterminate term of 25 years to life for the murder, doubled for the prior strike, plus a consecutive indeterminate term of 25 years to life for the firearm enhancement, plus a consecutive five-year term for the prior serious felony conviction.

Grant filed a timely notice of appeal.

## DISCUSISON

### I. The Gang Enhancement is Not Supported by Sufficient Evidence

Grant's first contention is the evidence is insufficient to support the finding that the crimes were committed for the benefit of a criminal street gang. We agree.

"The law regarding appellate review of claims challenging the sufficiency of the evidence in the context of gang enhancements is the same as that governing review of sufficiency claims generally. (*See People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)" (*People v. Leon* (2008) 161 Cal.App.4th 149, 161.) "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Ibid*.) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*Ibid*.)" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

"It has long been settled that expert testimony regarding whether a crime was gang related is admissible. ([*Albillar*], *supra*, 51 Cal.4th at p. 63; *People v. Gardeley* [(1996)] 14 Cal.4th [605,] 619.)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1050, fn. 5 (*Vang*).) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section186.22, subdivision (b)(1), gang enhancement. ([*Albillar*], *supra*, 51 Cal.4th at p. 63.)" (*Vang, supra*, at p. 1048.)

5

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1). (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a non-gang member benefited the gang because 'violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, "fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang . . ."']; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [relying on expert opinion that 'a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang'].)" (*Albillar, supra*, at p. 63.)

LAPD Officer Richard Delgado testified as a gang expert at Grant's trial. He described his training and experience in gang investigations, and explained that one of his assigned duties was to monitor the Hoovers gang. Officer Delgado testified regarding two prior murders committed by members of the Hoovers gang, and offered his opinion that Grant was a member of the gang. The prosecutor then asked Officer Delgado the following hypothetical question :

> "A known member of [the] Hoovers, we're going to call him gang member A, approaches another known member of [the] Hoovers, and we're going to call him gang member B. And this occurs at A's house on 77th and Hoover.

> "They get into a confrontation, and gang member A, along with other members of [the] Hoovers, surround gang member B. During that confrontation B puts his hand on a screwdriver he has in his pocket and tells A to meet him at 80th, between Figueroa and Hoover, so that they could fight.

> "Gang member B then leaves and goes to 80th and see[s] no one there, and proceeds straight to the home of a third Hoover gang member

6

who we'll call C – the home is on 81st – and he explains the confrontation that he had with gang member A.

"B then leaves C's house and goes to an alley near Figueroa and 76th. Gang member A goes to that location and shoots gang member B multiple times, killing him.

"Do you have an opinion as to whether or not the murder of gang member B is for the benefit of, in association with, or at the direction of the Hoover criminals?"

Officer Delgado answered the hypothetical question, yes. He explained:

"Well, the act of an individual killing another person is the most violent act a person can commit – an individual can commit. [¶] Now the gang, they thrive off of this notion or this idea of violence. Being that they do so, they want the community to fear them for a few reasons, but the main reason, the most important reason is for the simple fact that they want the community to be scared to call the police; it's as simple as that. They don't want them to report crimes or to cooperate with any type of law enforcement investigation.

"What that does is it enables the gang as a whole to continue with their pattern of criminal activity, whether it be selling narcotics, carrying firearms, or just congregating in large groups. . . ."

Officer Delgado then went on to explain that the killing of one gang member by a member of the same gang as hypothesized in the prosecutor's question presented unique factors:

"That's very important, because it's rare. It doesn't really happen. But what that means is that there are going to be members from within his own gang that didn't agree with it, that they may even become upset about it, but, at the end of the day, they're still going to have to second guess themselves when it comes to potentially confronting gang member A,

7

knowing that he had killed a member of his own gang. So, although they may not like gang member A, there is a respect still there because of the – the violent act. . . ."

Grant argues that there is no evidence in the record tending to show that he acted with the specific intent to promote, further, or assist the Hoovers gang when he shot Sims. The People contend that such intent can be inferred from the fact that Grant committed the crime "in concert with younger members of the gang." We find Grant's argument persuasive.

The problem we see with the People's position is that the evidence does not show that this murder was committed in concert with other Hoover gang members. There was evidence showing that "little homies" supported Grant when he and Sims "squared off" at Grant's house. Further, that Grant walked down the alley with other individuals prior to the shooting, and other individuals helped him move out of his house after the shooting. However, as to this latter evidence, there was no showing that any of the other individuals with Grant were gang members. In fact, the persons who walked down the alley with Grant and the persons who helped him move out of the house were never identified. In addition, even if these individuals were gang members, Grant was not accompanied by them immediately before the murder when he rode the bicycle through the alley with the rifle. At that point, Grant was only in the company of a dog. Thus, the only evidence that the murder was committed in concert with other gang members is the evidence showing that a group of "little homies" stood with Grant when he squared off with Sims well before the shooting, in a location that was a significant distance from the scene of the shooting. We agree with Grant that this does not show he acted with the specific intent to benefit or assist the Hoovers gang when he shot Sims. Evidence that a defendant was with other unidentified individuals earlier on the day of a crime, does support the conclusion that the defendant intended to benefit his gang when he committed a crime later in the day.

8

Neither does the evidence support the prosecution theory at trial that the crime was committed for the benefit of the Hoovers street gang. Officer Delgado testified the gang benefitted from the murder because it imparted fear in local residents. As put by Officer Delgado: the gang "want[s] the community to be scared to call the police; it's as simple as that." We find the claim that the murder benefitted the Hoovers is tenuous in this particular case. The victim was also a member of the Hoovers, and there is no evidence showing that Grant, or any Hoovers gang member, broadcast involvement in the killing. We are reluctant to find Officer Delgado's testimony sufficient to support the jury's gang benefit finding because to find so would essentially support the proposition that every violent crime committed by a gang member is subject to a gang benefit enhancement, and this would swallow up the requirements of the gang enhancement statute. As *People v. Ramirez* (2016) 244 Cal.App.4th 800 observes, it makes little sense to conclude that a gang member intends to benefit his gang when he kills a co-member of the gang, unless some gang-concerned reason is shown for the killing, such as where the victim gang member was thought to be cooperating with the police. (*Id*. at p. 819.) There is no evidence here tending to indicate that Grant wanted to kill Sims to provide some benefit to the Hoovers gang, such as stopping a snitch.[3]

## II.     Evidence that Erick Washington was Threatened was Properly Admitted

Grant next contends his murder conviction must be reversed because the trial court allowed the prosecution to elicit testimony from Erick Washington that he had been threatened by members of the Hoovers gang. We disagree.

### *The Trial Setting*

Before trial, the prosecutor advised the trial court that it was her intent to present evidence that Washington had been previously threatened by the Hoovers gang. The

---

[3]     Grant also contends the trial evidence is also insufficient to support the gang enhancement because there is no evidence that one of the primary activities of the Hoovers is the commission of the requisite enumerated offenses. Because we have found the gang enhancement was not supported by sufficient evidence, we need not decide this argument.

9

evidence was not that Washington had been threatened by Grant, but that Washington had been threatened in general. The trial court preliminary ruled that the evidence could be admitted because it concerned Washington's credibility and his willingness to testify. Grant's counsel asked for a hearing to determine whether Washington felt threatened for cooperating with authorities in a different case or in this case. Defense counsel's proposition was that if Washington had no fear about testifying in Grant's case, then evidence of the threats against him should not be admitted as it would be of little value on the issue of Washington's credibility and posed a risk that the jury would use it as substantive proof of Grant's guilt. The court granted defense counsel's request for a hearing.

At a hearing outside the presence of the jury, Washington testified that he received threats because he was "snitching" and "bringing the whole hood down." He initially testified that he was threatened on another case, but he later clarified that he had been threatened because of his cooperation with law enforcement in general, and that he had been threatened on both cases. He acknowledged he felt that the majority of the threats pertained to the other case. On cross-examination, Washington testified that if he was not called as a witness on the other case, he would not be afraid to testify in Grant's case. On redirect examination, however, Washington testified that even if he was not called as a witness on the other case, he would still be afraid for his family's safety. After hearing Washington's testimony, the trial court affirmed its preliminary ruling that the evidence of threats could be admitted because they were connected to both cases and Washington was afraid for his family's safety. The court indicated that if the prosecution used the evidence of threats during trial, it would give the jury a limiting instruction in accordance with *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*).

Later, just before Washington testified at trial, the prosecutor advised the trial court that she intended to admit four "Instagram" photographs which Washington had viewed. All of the photographs included language labeling Washington as a "snitch" or a "rat." Defense counsel objected to the admission of the postings on the ground that the defense was not going to attack Washington's credibility. The court ruled that all four

10

photographs could be admitted, explaining that "credibility is the heart and soul of any case."  At the same time, the court ruled that Washington could not testify about the effect it had on him and his family.

During direct examination, Washington testified that he had been labeled a "snitch" by the Hoovers, and that he felt he was in danger of getting killed because he was cooperating with law enforcement.  He testified that he and his family had been threatened in social media postings, and the four Instagram photographs were admitted in support of this testimony.  Before the social media photographs were shown to the jury, the trial court gave the following limiting instruction:

> "This evidence can be used only as it has relevance, if any, to the witness's state of mind, attitude, actions, bias, prejudice, lack or presence thereof. So it's going basically to his state of mind.  It's not offered for the truth; it's just offered to see how it affects him."

It is axiomatic that, when evidence is offered to show that a defendant directly made threats to dissuade a witness from testifying, the evidence may be used to support an inference of the defendant's consciousness of guilt.  However, when there is no evidence showing a defendant made the threats, or authorized a third-party to make the threats, evidence of threats is not admissible as substantive evidence of the defendant's guilt.  (*People v. Weiss* (1958) 50 Cal.2d 535, 554.)  Still, evidence showing that a third-party threatened a witness may be admissible for another proper purpose.  For example, under *Olguin, supra*, evidence showing that a third party threatened a witness may be admitted to show the witness is afraid to testify because the witness's fear could be relevant to the jury on the issue of the witness's credibility.  (*Olguin, supra*, 31 Cal.App.4th at pp. 1368-1369; see also *People v. Burgener* (2003) 29 Cal.4th 833, 869.)

As explained in *Olguin*:  "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying

11

despite fear of recrimination is important to fully evaluating his or her credibility. . . . [¶] Regardless of [a threat's] source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances." (*Olguin, supra*, 31 Cal.App.4th at pp. 1368-1369.)

Here, the evidence of threats against Washington was not used in relation to Grant's guilt as it was not offered to show Grant's consciousness of guilt. The evidence was offered only as a factor relevant to Washington's credibility. This was proper because Washington's testimony, among its other aspects, tended to show that Grant planned and premeditated the shooting of the victim, Sims. Washington's testimony, if believed by the jury, established that Sims and Grant "squared off" on the day of the shooting. Additional evidence showed that Sims was shot in an alley near Grant's home. Pieced all together, the evidence showed that, after a fight, Grant got a gun, got on a bicycle, and rode to the location of the shooting — a planned and premeditated murder. It tended to undermine Grant's self-defense defense. In summary, because Washington's testimony implicated Grant in the shooting and in planning the shooting, and because Washington's credibility was an important issue for the jury to evaluate, there was no error in admitting the evidence of threats. (*Olguin, supra*, 31 Cal.App.4th at pp. 1368-1369.)

Assuming that the evidence of threats should not have been admitted, we find the error in admitting the evidence harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. Apart from Washington, a different witness, Castillo L., reported to police that on the night of the murder, he saw Grant with a rifle, wrapped up in a shirt. Further, the videotapes recovered from the cameras in the alley showed Grant riding a bicycle down the alley, heading toward the scene of the shooting, carrying what looks like a rifle, wrapped in clothing, on the handlebars of the bicycle. A person on one of the videotapes threw a pair of shorts onto a roof. The shorts were recovered and tested, and indicated Grant's DNA and gunshot residue were on the shorts. Further, of course, Washington's testimony implicating Grant would have been admitted, just without the background of

12

the threats evidence.  We are confident that, with or without the jury's hearing the evidence of threats, the outcome of Grant's trial would have been the same.

**III.    The Trial Court Was Not Required to Instruct on Voluntary Manslaughter**

Grant contends his murder conviction must be reversed because the trial court erred in failing to instruct on the lesser offense of voluntary manslaughter based on heat of passion.  We disagree.

"[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present."  (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)  "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself."  (*People v. Breverman* (1998) 19 Cal.4th 142, 162-163 (*Breverman*).)  "Conversely, even on request, a trial judge has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)  "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ."  (*Breverman, supra*, at p. 162.)  Evidence is substantial for this purpose if it could cause a jury composed of reasonable persons to conclude that the defendant committed the lesser but not the greater offense.  (*Ibid*.)  Such instruction is warranted only if "'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser."  (*People v. Memro* (1995) 11 Cal.4th 786, 871.)  "'"[S]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense."' [Citations.]"  (*People v. Valdez* (2004) 32 Cal.4th 73, 116.)

"'"Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).)  A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.  (§ 192.)"  [Citation.]  Generally, the intent to unlawfully kill constitutes malice.  [Citations.]  "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined

13

circumstances[, such as] when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a))."'" (*People v. Moye* (2009) 47 Cal.4th 537, 549.)

The words "upon a sudden quarrel or heat of passion," in section 192, subdivision (a), includes both a subjective and an objective component. As to the objective component, the victim's conduct must have been sufficiently provoking so as to cause a reasonable person of average disposition to act rashly or without due deliberation and reflection. (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) "The standard is not the reaction of a 'reasonable gang member.'" (*Ibid.*)

"'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.] [¶] . . .'"However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. . . ." [Citation.]' [Citation.]" (*People v. Moye, supra*, 47 Cal.4th at pp. 549-550.)

The trial court had no duty to instruct on heat of passion voluntary manslaughter as a lesser included offense of murder because there was not substantial evidence to support a jury's finding that any conduct by Sims provoked Grant to shoot Sims upon a sudden quarrel or heat of passion. At most, the evidence showed that during an incident separate in time and place from the murder, Sims reached for a screwdriver in his back pocket when he and Grant decided to fight. No reasonable person of average disposition would have been so provoked by such conduct that it would cause him to go home, retrieve a gun, and hours later ride with the gun on a bicycle to a separate place, and shoot the man who wielded the screwdriver. As the Supreme Court taught in *People v. Gutierrez* (2002) 28 Cal.4th 1083, a person's desire for revenge is not sufficient to reduce murder to voluntary manslaughter under a heat of passion theory. (*Id.* at p. 1144.)

14

We think that enough has been said, but note that even if the trial court erred in not instructing on the crime of heat of passion voluntary manslaughter, the error was harmless beyond all possible doubt. A failure to instruct on a lesser included offense is harmless when the factual question posed by the omitted instruction was necessarily resolved unfavorably to the defendant under other instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 96-97.) At Grant's trial, the jury was instructed on first degree premeditated murder and on second degree murder. Within the instructions on first degree premeditated murder, the jury was told: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (See CALCRIM No. 521.) Further, the instructions on murder told the jury that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. . . . If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (See CALCRIM No. 522.) The jury's finding that Grant committed first degree premeditated murder necessarily demonstrates that the jury found he did not act "rashly, impulsively, or without careful consideration," and that there was no provocation. Accordingly, any error in failing to instruct on heat of passion voluntary manslaughter must be viewed as harmless beyond all doubt. The jury's finding that Grant did not kill Sims rashly, impulsively, or without careful consideration, and without provocation, demonstrates that it would never have found him guilty of voluntary manslaughter based on heat of passion.

*People v. Peau* (2015) 236 Cal.App.4th 823 (*Peau*) is instructive. In *Peau*, just as in Grant's case before us today, the jury was instructed on first degree premeditated murder and second degree murder, but not on heat of passion voluntary manslaughter. Further, the instructions told the jury that it could not return a verdict of first degree premeditated murder unless it found that the defendant "'carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.'" (*Peau, supra*, 236 Cal.App.4th at p. 831.) The jury convicted the defendant of

15

first degree premeditated murder.  The Court of Appeal concluded that the failure to instruct on heat of passion voluntary manslaughter "was harmless beyond a reasonable doubt because the jury found that [the] murder was willful, deliberate, and premeditated." (*Id*. at p. 832.)  In coming to this conclusion, the Court of Appeal reasoned that a jury's finding that a murder is willful, deliberate, and premeditated "'is manifestly inconsistent with having acted under the heat of passion.'" (*Id*. at p. 831, quoting *People v. Wharton* (1991) 53 Cal.3d 522, 572.)

Grant argues we should not follow *Peau* because it was wrongly decided.  We are not persuaded.  To the contrary; we think the decision is well reasoned.  When a jury is instructed to decide whether a defendant acted willfully, deliberately and with premeditation, and that acting rashly, impulsively, or without careful consideration is not deliberate and premeditated murder, and to decide whether a defendant acted in response to provocation, the jury is implicitly decides the elements  involved in heat of passion manslaughter.

## DISPOSITION

The judgment is modified to reflect the reversal of the jury's gang benefit finding. As modified, the judgment is affirmed.


BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.


16