Filed 5/3/21  P. v. Montanez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C083092 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F04910) |
| v. | |
| JOHN MONTANEZ, JR., | |
| Defendant and Appellant. | |

The jury watched video surveillance of defendant John Montanez, Jr., sporting gang colors and gang tattoos, fire six shots toward the two victims in the parking lot of the Arden Fair Mall.  The jurors found him guilty of two counts of attempted murder and found true various weapon and gang enhancements.  On appeal, he challenges the sufficiency of the evidence to support the attempted murder conviction and the gang enhancement, the jury instruction that was given on the kill zone and the failure to give a jury instruction on the lesser included offense of assault with a deadly weapon, and other

1

asserted missteps by the gang expert. In supplemental briefing, he asserts his case must be remanded to permit the trial court to exercise the discretion provided to it by Senate Bill No. 620 (2017-2018 Reg. Sess.).

Finding no prejudicial error, we affirm.

## FACTS

### Attempted Murder

Defendant and Jose Vasquez, both validated members of the Norteño criminal street gang and its subset, Varrio Franklin Boulevard (VFB), were at the mall on the afternoon of July 31, 2013. As they passed K.V., D.S., and D.M., none of whom were gang members or armed, defendant had eye contact with D.S. which, according to K.V., connoted a lack of respect. K.V. noticed that defendant and Vasquez were Hispanic and were wearing red, the color worn by Norteño gang members. Words were exchanged and K.V., who admitted he "had a head of rage," challenged defendant to a fight, saying "I'm going to knock your bitch ass out." They agreed to go outside and the five of them proceeded to the Macy's parking lot. En route, defendant shoved D.S. Their encounters were captured on videotape.

Once they got outside, defendant exclaimed, "Fuck this," and pulled out a gun and started firing. K.V. started "running for [his] life," zigzagging between the parked cars. D.M., scared for his life, ran back towards the mall and then across the street. He later told a detective he believed the guys were trying to kill him. A woman, who was driving out of the parking lot, heard the gunfire, saw males running off, and then noticed another male with a gun fire off a shot and run toward J.C. Penney's.

Although defendant fired six shots, no one was hit. At least three cars sustained bullet damage. During the investigation, D.M. told the police the Hispanic males looked "like Northerners" because they were Mexican and "wearing red." At trial, D.M. denied the incident was gang related. In a statement to police, he said he did not believe the

2

shooter was actually firing at him. K.V. identified defendant as the shooter in a photographic lineup and from a security image the police showed him. Video cameras captured the shooting.

Defendant fled the scene and destroyed and discarded the gun. He lied to the police when he was first questioned.

Defendant testified in his own defense. He disavowed gang membership after high school and denied that the altercations he was involved in in prison were gang related. He claimed he got his tattoos while he was still involved with the gang. He minimized the amount of red he was wearing during the shooting, pointing out that his hat was red, white, and blue. Defendant maintained that one of the three guys tripped him and, in response, he pushed back. He explained that Vasquez handed the gun to him as they walked toward the outside. He admitted firing the gun, but claimed he was scared and nervous and did not intend to hit anyone. He insisted he fired the gun up into the air as he ran away from the group. Although he meant to only shoot into the air, he accidentally shot into some nearby cars.

**Further Gang Evidence**

Five police officers testified to contacts they had with defendant between 2007 and 2011. During these contacts, the officers observed him in gang clothing, associating with known gang members, or displaying his gang-related tattoos. He admitted gang membership and ownership of a fully loaded handgun.

Detective John Sample testified as an expert on criminal street gangs, specifically Norteño gangs. He provided the jury with the now customary primer on the psychology and sociology of criminal street gangs, including their customary colors, gang signs, turf boundaries, subsets, and common crimes. Central to their mission is to instill fear in the community and command respect. He explained how gang members pay "taxes" to subsidize the upper echelon of the gang hierarchy, particularly those housed in prison.

3

He was careful to describe the relationship between Norteño and its various subsets and to point out that subsets often use the same identifying characteristics, such as the color red and the number 14. Subsets frequently join together to commit crimes, to maintain safety, and as a "power symbol." Membership can be fluid.

Sample opined that the subset VFB is a gang engaged in a pattern of criminal activity. He relied on two incidents, one in 2011 and one in 2012 to establish the requisite pattern. The first involved a validated VFB member who was found in possession of stolen guns and methamphetamine while in association with two other Norteños and convicted of a gang offense. The second involved another member of VFB who was convicted of being a felon in possession of a firearm. He further opined that the primary criminal activities of Norteños in Sacramento, and VFB in particular, were possession of guns, shootings, attempted murder, and sales of methamphetamine and cocaine. They benefited the gangs by instilling fear in nonmembers.

Sample chronicled defendant's lengthy affiliation with the Norteños, his admission he was a gang member, his frequent association with gang members, and his possession of handguns, a common gang practice. He was arrested in this case wearing red and white shoes, with a red tattoo on his chest, in the company of another Norteño gang member. He recounted two further incidents of gang-related conduct while defendant had been in jail.

Most importantly, Sample opined, based on a hypothetical that mirrored the facts in this case, that a crime like the Arden Fair Mall shooting was gang related and was committed with the specific intent to promote, further, or assist criminal conduct by gang members. Specifically, while firing defendant was in the presence of another VFB gang member, they were both wearing red, defendant was tattooed with common Norteño symbols, and it appeared defendant's hand gestures were similar to gang hand signs. He opined that defendant committed the crimes at the mall in association with the Norteño gang, and for the benefit of the gang.

4

## DISCUSSION

## I

### *Instructional Error*

**A. Kill Zone**

The trial court acceded to the prosecutor's request to instruct the jury on the kill zone theory of liability for attempted murder. Although defendant failed to object, we consider the issue because the alleged instructional error on intent affects defendant's substantial rights. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1294, fn. 28.) On appeal, defendant argues the trial court committed prejudicial error by instructing the jury on the kill zone theory.

The challenged instruction reads as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'

"In order to convict the defendant of the attempted murder of [K.V.], the People must prove that the defendant not only intended to kill [D.S.], but also either intended to kill [K.V.] or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [K.V.], or intended to kill [D.S.] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [K.V.]

"In order to convict the defendant of the attempted murder of [D.S.], the People must prove that the defendant not only intended to kill [K.V.], but also either intended to kill [D.S.], or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [D.S.] or intended to kill [K.V.] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [D.S.]"

5

The trial court has a duty to refrain from instructing the jury on principles of law that it may draw a particular inference absent evidence in the record which, if believed by the jury, will support the inference. (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921.) Accordingly, we must determine whether the record contains evidence that would support application of the kill zone theory in this case. First, however, we will explain how the kill zone operates to expand criminal liability for attempted murder in cases in which it is difficult to prove the requisite specific intent to kill. The evolution of the theory has followed a strange trajectory.

The problem the theory evolved to address is proving attempted murder which, it turns out, can be more difficult than proving murder for several reasons. The mental state for murder differs from attempted murder. Whereas murder does not require an intent to kill, attempted murder requires the specific intent to kill coupled with the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Moreover, under the well accepted doctrine of transferred intent, a shooter who intends to shoot one person and shoots a bystander is subject to the same criminal liability that would have been imposed if the fatal shot struck the intended victim. (*People v. Scott* (1996) 14 Cal.4th 544, 546.) The shooter's culpability is not diminished simply because he or she missed the target. The transferred intent fiction cannot, however, be applied to support attempted murder convictions when the victims were not killed. (*People v. Perez* (2010) 50 Cal.4th 222, 232 (*Perez*).)

The kill zone theory allows the prosecution to utilize the concept of "concurrent intent" in lieu of the forbidden notion of transferring intent in an attempted murder case. Interestingly, the Supreme Court blessed the kill zone theory predicated on concurrent intent in a transferred intent case. In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), the dispositive issue had nothing to do with kill zones. Rather as the court characterized it, "We must decide whether defendant's intent to kill the murder victim transfers to an alleged attempted murder victim." (*Id.* at p. 317.) The answer to that question was

6

easy—transferred intent does not apply to attempted murder. (*Ibid*.) But, the court concluded, the jury instructions as given did not allow the jury to apply transferred intent to the attempted murder counts and, therefore, there was no error and no basis for reversal. "The question the jury asked the court, and the foreperson's statements, showed the jury was conscientiously parsing the precise language of the instructions which, in this case, did *not* transfer intent to a person merely injured. No reason appears to believe this jury would have misread the instruction's simple language as saying what it did not say. The court also correctly answered the jury's specific question on this point. Accordingly, we see no reasonable likelihood that the jury understood the charge as permitting it to transfer intent to kill to a person merely injured." (*Id*. at p. 333.) That could have been the end of the discussion since the court resolved the question before it.

Instead, the court digressed. The unavailability of transferred intent to prove attempted murder did not necessarily thwart attempted murder prosecutions. Invoking what a court in Maryland characterized as "the kill zone," the court accepted the proposition that a perpetrator could intend to kill a target and at the same time intend to kill everyone in close proximity to the target. (*Bland, supra*, 28 Cal.4th at p. 329, citing *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984].) "The *Ford* court explained that although the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Bland, supra*, at p. 329.)

There is an important caveat to the Supreme Court's imprimatur on the kill zone theory. The court admonished, "This concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is

7

simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra*, 28 Cal.4th at p. 331, fn. 6.) In dicta, the court volunteered that such an inference was justified, indeed virtually compelled, when a shooter, as there, "fired a flurry of bullets at the fleeing car and thereby created a kill zone." (*Id.* at p. 331.)

Born in dicta, the kill zone theory remained on shaky ground in the Supreme Court. In two prominent single shot cases, *People v. Stone* (2009) 46 Cal.4th 131 and *Perez, supra*, 50 Cal.4th 222, the court reversed the convictions for attempted murder, save one. In *Stone*, the trial court instructed the jury on the kill zone. This was error. The Supreme Court found the kill zone instruction did not fit the charge or the facts of the case. (*Stone, supra*, at p. 138.) The kill zone, the court explained, "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons. Here, defendant was charged with but a single count of attempted murder. He was not charged with 10 attempted murders, one for each member of the group at which he shot." (*Ibid*.)

The central issue in *Stone*, however, was not the propriety of the kill zone instruction, but whether there was insufficient evidence to support the attempted murder conviction because the conviction may have been based in part, "on the understanding that attempted murder requires the intent to kill a particular person." (*Stone, supra*, 46 Cal.4th at p. 139.) It does not. "[W]e conclude that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Id.* at p. 140.) The court's conclusion is consistent with the fundamental principle that attempted murder requires a specific intent to kill a human being, not a specific human being. The case was remanded to the Court of Appeal to "consider any issues regarding the variance between the information—alleging defendant intended to kill Joel F.—and

8

the proof at trial—showing defendant intended to kill someone, although not specifically Joel F." (*Id.* at p. 142.)

In *Perez*, the defendant fired one shot in the direction of seven police officers and one civilian, all of whom were standing close together. (*Perez, supra*, 50 Cal.4th at p. 224.) He was convicted of eight counts of attempted murder. (*Ibid.*) The question presented was not whether the jury was properly instructed, but whether there was sufficient evidence to support all eight counts of attempted murder. (*Id.* at pp. 224-225.) Justice Baxter, writing for a unanimous court, found there was not. "In this case there is no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers fired upon. Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control. Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230-231, fns. omitted.)

The prosecution, however, offered the kill zone theory of expanded liability to save the seven attempted murder convictions, citing *Bland.* The court rejected the applicability of the kill zone theory to the facts before it. "The facts of this case do not establish that defendant created a 'kill zone' by firing a single shot from a moving car at a distance of 60 feet at the group of eight individuals, notwithstanding that they were all standing in relatively close proximity to one another. *Bland's* kill zone theory of multiple attempted murder is necessarily defined by the nature and scope of the attack. The firing of a single bullet under these circumstances is not the equivalent of using an explosive device with intent to kill everyone in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon. The indiscriminate firing of a single shot at a group of persons, without more, does not

9

amount to an attempted murder of everyone in the group. The holding in *Bland* is not controlling on these facts." (*Perez, supra*, 50 Cal.4th at p. 232.)

Attempted murder is not a mere calculation of risk. A defendant's act endangering individuals alone does not translate into the specific intent to kill necessary to sustain an attempted murder conviction. In *Perez*, it was true that all eight persons standing in close proximity to one another when defendant fired were at risk of lethal harm. But a unanimous Supreme Court made clear that such a scenario does not constitute a kill zone and the facts did not support any more than one count of attempted murder. As in *Stone*, the Supreme Court nodded to the theoretical potential of a kill zone, but refused to apply it to the facts before it.

The kill zone theory came before the Supreme Court again in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) where two defendants, fellow gang members, encountered a rival gang member at a neighborhood block party attended by 30 or so people. One of the defendants fired five bullets from either 100 or 160 feet away at the intended victim who was standing next to a gang associate. Neither was hit but a bystander was killed. (*Id*. at pp. 599-600.) The two defendants were charged with one count of murder and two counts of attempted murder of the intended victim and his gang associate. (*Id*. at p. 600.) The trial court gave CALCRIM No. 600, a kill zone instruction, addressed to the attempted murder of the gang associate. (*Canizales, supra*, at p. 601.)

In reviewing the propriety of the instruction, the Supreme Court reaffirmed the conceptual underpinnings of the kill zone theory: that a jury may infer an intent to kill a person who was not the primary target of a murderous attack based on evidence that the person was in within a defined area in which the primary target was located and defendant intended to kill everyone within that area, styled a "kill zone," as a means of assuring the death of the primary target.

Summarizing the requirements, the court declared:

10

"We therefore conclude that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm.

"In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra*, 7 Cal.5th at p. 607.)

Here, the prosecutor argued two theories of intent. He urged the jury to find that defendant intended to kill both K.V. and D.S. based on the testimony he was having some type of dispute with both of them. As we discuss *post*, there is ample evidence to support an intent to kill both young men. The prosecutor also argued, however, the kill zone theory. He explained, "If you find a person may intend to kill a specific victim or victims, at the same time intending to kill everyone in a particular zone of harm. So this is the theory where if you find -- you know, where, you know, we believe he tried to kill [K.V.] We believe, no, he was having more of a dispute -- when I watched that fight, it looked like he was really cuing in on [D.S.]. If you find he was

11

attempting to kill one of them, but accomplishing that by killing everyone in that kill zone, in that range of fire, then he has the intent to kill both. That's what we have here." The prosecutor's argument is an accurate statement of the law regarding a kill zone. He then marshaled the physical evidence, including the location of the bullet casings, to define what he considered to be the kill zone.

This case does not fit the profile of clearly nontargeted victims or bystanders getting caught in an explosion of violence. D.S. purportedly had eye contact with defendant and tripped him. But it was K.V. who shouted the epithet, "I am going to knock your bitch ass out," arguably challenging defendant to a fight. There was evidence, therefore, that both had triggered defendant's wrath. But rather than deciphering if that supposition was true and whether there was sufficient independent evidence that defendant intended to kill each one of them, the prosecutor used the kill zone theory as an alternative kind of shortcut for the jury to find two counts of attempted murder. In other words, the argument is that once defendant started shooting at his victims he created a kill zone and it was reasonable for the jury to infer that he intended to kill everyone in that zone, regardless of whether he identified a particular target.

The kill zone is not necessary to achieve the same objective. In *Stone*, the Supreme Court held that a defendant need not specifically intend to kill a particular person as long as he or she intends to kill anyone. Intending to kill *anyone* fits the facts of this case more accurately than the questionable assumption that defendant intended to kill *everyone* in the hypothetical kill zone, including random shoppers entering or leaving the mall. (See *People v. Foster* (2021) 61 Cal.App.5th 430, 440-441 & fn. 16.)

Nonetheless, the prosecutor's argument accurately described the kill zone theory. The number of shots did not outnumber the victims. Defendant fired six shots at K.V. and D.S. as they ran away from him. A jury could reasonably infer that he specifically intended to kill everyone in the kill zone he created in order to kill his target or targets. In this way, the facts are most analogous to those presented in *Bland* wherein the

12

defendants sprayed a flurry of bullets inside a car with three passengers. (*Bland, supra*, 28 Cal.4th at pp. 330-331.) In *Bland*, the court intimated that the evidence virtually compelled the inference that even if the shooter wanted to kill the driver rather than his passengers, by firing a flurry of bullets at a fleeing car, the defendant and his cohort created a kill zone. (*Ibid.*) Similarly, defendant's flurry of bullets also created a kill zone and the finding fully supports attempted murder convictions as to both K.V. and D.S.

**B. Failure to Instruct Sua Sponte on Assault with a Deadly Weapon**

Defendant contends the trial court erred by failing to instruct the jury that assault with a deadly weapon is a lesser included offense of attempted murder. He concedes that he must import the elements of the firearm use enhancement as an element of the assault to pass the accusatory pleading test and thereby trigger the sua sponte obligation to instruct on a lesser included offense. He also concedes that our Supreme Court in *People v. Wolcott* (1983) 34 Cal.3d 92 (*Wolcott*) rejected the attempt to add the elements of enhancements to the elements of the offense to find a lesser included offense. Nevertheless, he boldly argues *Wolcott* was wrongly decided or, at least, was overruled "*sub rosa*" by the United States Supreme Court in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*). This argument too has been soundly rejected. (*People v. Alarcon* (2012) 210 Cal.App.4th 432, 436-439 (*Alarcon*).)

The basic principles need not detain us. A trial court has a sua sponte obligation to instruct on lesser included offenses if there is substantial evidence the defendant is guilty only of the lesser offense and, even if for tactical reasons, the parties object. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) Defendant does not suggest that assault

13

with a deadly weapon is a lesser included offense of attempted murder under the elements test. Rather, he asserts the firearm enhancement is the "functional equivalent" of an element of the offense as alleged in the accusatory pleading, and therefore, assault with a deadly weapon is a lesser included offense of attempted murder pursuant to the accusatory pleading test and the rationale employed by the United States Supreme Court in *Apprendi*. We disagree for all the reasons explained by our colleagues in the Second District in *Alarcon.*

Our analysis must begin with *Wolcott, supra*, 34 Cal.3d 92, wherein the Supreme Court held that "a gun use enhancement allegation in an accusatory pleading containing a robbery count could not be used to establish that assault with a deadly weapon was included within the charged robbery." (*Alarcon, supra*, 210 Cal.App.4th at p. 436.) Courts of Appeal have followed *Wolcott*'s lead. Following *Wolcott*, courts have concluded that under the accusatory pleading test, gun use and great bodily injury enhancement allegations accompanying an attempted murder charge do not render assault with a deadly weapon a lesser included offense of the charged attempted murder. (*People v. Parks* (2004) 118 Cal.App.4th 1, 6; *People v. Richmond* (1991) 2 Cal.App.4th 610, 616.)

Defendant tries mightily to evade such a solid precedential roadblock. First, he straight forwardly proclaims that the Supreme Court is wrong. Whether or not he is right, we are bound by a Supreme Court ruling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Second, he insists *Wolcott* was upended by *Apprendi* and its progeny. But *Apprendi* is inapposite.

The vice in *Apprendi* was not a failure to instruct on a lesser included offense, but the failure to have a jury determine the applicability of a sentence enhancement related to conduct. (*Apprendi, supra*, 530 U.S. at p. 490 ["Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"].) Overlooking the

14

substance of the issue before the United States Supreme Court, defendant extracts a handy phrase the court used to describe the constitutional flaw in allowing a judge to determine whether a defendant should be subjected to an enhanced term of imprisonment. The court explained that "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent of an element of a greater offense* than the one covered by the jury's guilty verdict." (*Apprendi, supra*, 530 U.S. at p. 494, fn. 19, italics added.)

It is true that the California Supreme Court utilized the "functional equivalency" concept in upholding a defendant's double jeopardy challenge to retrial on a premeditation allegation the jury had rejected in the first trial stating that "*Apprendi* compels the conclusion that [the premeditation allegation] constitutes an element of the offense" for purposes of the double jeopardy clauses in the federal and state Constitutions. (*People v. Seel* (2004) 34 Cal.4th 535, 548-550.) But, as the court aptly explained in *Alarcon*: "[S]ince *Seel*, our Supreme Court has affirmed the vitality of *Wolcott* and the limited scope of *Apprendi*. In *People v. Sloan* (2007) 42 Cal.4th 110, 115-123, the court held that enhancements may not be considered to determine whether an offense is necessarily included within another crime, for purposes of the rule barring multiple convictions based on lesser included offenses. In so concluding, the court discussed with approval an appellate court decision that relied on *Wolcott*, and rejected a contention predicated on *Apprendi*. [Citation.] Furthermore, in a companion case, the court determined that *Apprendi* did not mandate that enhancements—in isolation from the charges that they accompany—are subject to the multiple conviction rule. (*People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134.) Later, in holding that *Apprendi* did not transform enhancement allegations into elements of greater offenses for purposes of a double jeopardy statute ([Pen. Code, ]§ 1023), the court underscored its rejection of 'the notion that the high court's "functional equivalent" statement requires us to treat penalty allegations as if they were actual elements of offenses for all purposes under state law.'

15

(*Porter v. Superior Court* (2009) 47 Cal.4th 125, 137.)  Accordingly, neither *Apprendi* nor *Seel* undermined *Wolcott* and its progeny, which are dispositive here."  (*Alarcon, supra*, 210 Cal.App.4th at pp. 437-438.)

Nor did the court in *Alarcon* accept the defendant's invitation to view *Apprendi* broadly enough to encompass the accusatory pleading rule.  The rule requiring courts to instruct on lesser included offenses, both before and after *Apprendi*, the court concluded, arises only under California law in noncapital cases.  Thus, *Wolcott*, not *Apprendi*, "controls the application of the instructional rule, insofar as the rule relies on the accusatory pleading test."  (*Alarcon, supra*, 210 Cal.App.4th at p. 439.)

We find *Alarcon* persuasive and dispositive.  We therefore reject defendant's argument that *Apprendi* undermines *Wolcott* and requires the trial court to instruct on assault with a deadly weapon as a lesser included offense of attempted murder where, as here, a firearm use enhancement is alleged.  There was no instructional error.

## II

### *Sufficiency of the Evidence*

**A.  Attempted Murder**

Defendant makes what could be a compelling closing argument to the jury that there is insufficient evidence that he specifically intended to kill K.V. and D.S. when he fired six shots at them.  Because he did not express an intent to kill, the evidence of his intent is entirely circumstantial, and in his view, far too weak to sustain a conviction for attempted murder.  The jury had the opportunity to consider his argument in light of the entire record, including the videotape of the shooting and defendant's explanation that he merely intended to frighten the victims, and found he intended to kill K.V. and D.S. beyond a reasonable doubt.  It was the jury's prerogative, not ours, to make that determination and the scope of appellate review is quite narrow.  Having reviewed the

16

entire record in the light most favorable to the prosecution, as we must, we conclude there is ample evidence to support the jury's verdict.

K.V. and D.M. testified at trial. D.S. did not. K.V. gave a harrowing account of the shooting after describing the events that led up to it. He was a candid witness, ready to admit to his own shortcomings including a hot temper. Although it was D.S. who had eye contact with defendant and reported it to K.V., it was K.V. who, with "a head of rage," reacted aggressively and challenged defendant and Vasquez to a fight outside with the threat, "I'm going to knock your bitch ass out." The five young men marched through the mall together, en route presumably to the challenged fight outdoors. En route, D.S. tripped defendant. Defendant retaliated by pushing him. They continued to the exit.

But this was not to be an old-fashioned fist fight. As they left the mall, Vasquez handed defendant a loaded gun. The videotape captured the shooting. Despite defendant's testimony that he shot in the air, the videotape shows him holding the gun at his waist and shooting. K.V. testified that he and the others started running away. He hunched over and darted between the cars. Defendant fired six shots. At least three bullets struck cars in the parking lot, hitting a bumper, a hood, and a trunk, all in close vicinity to K.V. A woman leaving the mall in her car at the time gave a similar account. She too testified that defendant was shooting at someone.

The percipient witnesses' testimony, coupled with the videotape capturing the shooting, provides compelling circumstantial evidence that defendant intended to kill his victims. As the prosecutor argued to the jury, he could have sought protection at the mall rather than accepting K.V.'s challenge and going out to fight. He could have fought them with his hands. But, evidencing a specific intent to kill rather than maim or protect himself, he took the gun from Vasquez, shouted, "Fuck this," and began shooting at them. The jury could reasonably infer from the strength of this evidence that he entertained the requisite intent for attempted murder.

17

Defendant insists, however, the evidence was not substantial. He relies on the strength of his own testimony. The jury, of course, may have found his testimony incredible and discounted what he had to say. The record supports a finding that he was not to be believed. After all, he stumbled, tried to rehabilitate himself, told half-truths, if not blatant lies, and offered incredible and improbable explanations for his behavior. In short, the jury was free to disregard his testimony that he did not intend to kill anyone, that he shot only out of nervousness and fear, and that he destroyed the gun, not so the shell casings could not be traced back to the gun, but to ensure no one else would be hurt. Moreover, the jury was free to conclude that the destruction of the gun and defendant's flight from the scene following the shooting evidenced a consciousness of guilt.

Defendant relies on several cases in which the evidence was not sufficient to support attempted murder. (*People v. Ratliff* (1986) 41 Cal.3d 675; *People v. Hayes* (1985) 38 Cal.3d 780; *People v. Ramos* (2011) 193 Cal.App.4th 43; *People v. Osband* (1996) 13 Cal.4th 622.) We need not decipher the evidence in each of these cases. Each one is fact specific and the totality of the circumstances varies. The law is clear. Our review is limited, the jury's assessment of the credibility of the witnesses is determinative, and we must affirm their judgment if there is credible evidence of solid value. Here that calculation is straightforward. The jury did not believe defendant. The jurors watched the video and listened to the percipient witnesses. There is substantial circumstantial evidence to support the jury's conclusion that when defendant fired six shots at his two unarmed victims, both of whom were running away from him, he specifically intended to kill them. We must affirm the jurors' determination.

## B. Gang Enhancement

Defendant contends the evidence was insufficient to sustain the jury's finding that he committed the attempted murders for the benefit of a criminal street gang within the

18

meaning of Penal Code section 186.22, subdivision (b)(1),[1] which provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." "Like a conviction unsupported by substantial evidence, a true finding on a gang enhancement without sufficient support in the evidence violates a defendant's federal and state constitutional rights and must be reversed." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 947 (*Franklin*).)

The evidence must establish both of the two prongs to the gang enhancement under section 186.22, subdivision (b)(1). "First, the prosecution is required to prove that the underlying felonies were 'committed for the benefit of, at the direction of, or in association with any criminal street gang.' (§ 186.22[, subd. ](b)(1).) Second there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 561 (*Rios*).)

In deciding whether substantial evidence supports both prongs, we apply the familiar standard of review for challenges to the sufficiency of the evidence. (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1359 (*Daniel C.*).) We again review the entire record in search of reasonable and credible evidence of solid value, viewing all the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in favor of the jury's findings. (*People v. Ramon* (2009) 175 Cal.App.4th 843, 850 (*Ramon*); *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196 (*Frank S.*).) We cannot,

---

[1]  Undesignated statutory references are to the Penal Code.

19

however, go beyond reasonable inferences into the realm of speculation, conjecture, surmise, or guesswork. (*Ramon, supra*, at p. 851.) "A trier of fact may rely on inferences to support a conviction only if those inferences are 'of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt' that the inferred facts are true." (*Rios, supra*, 222 Cal.App.4th at p. 564.)

We agree with defendant that not every crime committed by a gang member is gang related. (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*); *Rios, supra*, 222 Cal.App.4th at p. 561.) Nor can a crime be found to be gang related simply because the perpetrator is a gang member with a criminal history. (*Frank S., supra*, 141 Cal.App.4th at p. 1199.) Merely belonging to a gang at the time of the commission of the charged conduct does not constitute substantial evidence to support an inference the perpetrator specifically intended to promote, further, or assist any criminal conduct by gang members. (*Rios, supra*, at pp. 573-574.) Otherwise, as the court observed in *Rios*, "the gang enhancement would be used to merely punish gang membership." (*Id*. at p. 574.)

While a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045-1046 (*Vang*).) A hypothetical question must pose facts shown by the evidence because "[a] hypothetical question not based on the evidence is irrelevant and of no help to the jury." (*Id*. at p. 1046; *Franklin, supra*, 248 Cal.App.4th at p. 949.)

Indeed, there are caveats to the sufficiency of gang expert testimony to support the imposition of a gang enhancement. General opinion testimony when offered by a gang expert " 'opens the door for prosecutors to enhance many felonies as gang-related' (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199), by expanding the gang enhancement statute

20

to cover virtually *any* crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities." (*Daniel C., supra*, 195 Cal.App.4th at p. 1364.) Moreover, "purely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because any violent crime enhances the gang's reputation is insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820 (*Ramirez*).)

Nevertheless, gang experts play a central role in establishing both prongs of the section 186.22 enhancement. " 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*Vang, supra*, 52 Cal.4th at p. 1048.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subd. ](b)(1)." (*Albillar, supra*, 51 Cal.4th at p. 63.) The facts in *Albillar* are instructive and reflective of the Supreme Court's deference to the gang expert's testimony.

In *Albillar*, three 20-something gang members, heavily tattooed with gang signs, assisted each other in raping a 15-year old girl in their apartment, which was cluttered with gang paraphernalia including gang clothing, photographs of the defendants and fellow gang members wearing gang clothing and flashing gang signs, papers with gang graffiti, and a phone list of fellow gang members. (*Albillar, supra*, 51 Cal.4th at pp. 51-52, 62.) The Supreme Court summarized the gang expert's testimony this way: "Because each defendant was a member of the Southside Chiques, he could and did rely on the others' cooperation in committing the offenses against Amanda M.: Albert suppressed his own personal interest in having sex with the victim and immediately yielded to the others when they asked if they could 'get in'; without another word being

21

spoken, Albert and Madrigal held the victim's legs down while Alex raped her; Albert and Alex blocked the door while Madrigal raped her; and Alex and Madrigal remained in the apartment while Albert raped her. Defendants knew, because of the nature of the gang, that no one would be a 'rat,' which would be 'one of the worst things, if not the worst thing the gang can have within itself.' " (*Id.* at p. 61.)

The gang expert testified that, not only did gang members work in association but also that the rapes were perpetrated to benefit the Southside Chiques gang. (*Albillar, supra*, 51 Cal.4th at p. 63.) He responded to a hypothetical based on the facts of the charged crimes where the victim knew that at least two of the perpetrators were gang members. The expert stated that " 'More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside] Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.' " (*Id.* at p. 63.)

In contrast to the abundant evidence presented in *Abillar* that the crimes were committed in association with, and for the benefit of, a criminal street gang, defendant cites to an ever increasing body of cases in which the courts have found the evidence insufficient to sustain the gang enhancement. (See, e.g., *People v. Gardeley* (1996) 14 Cal.4th 605, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *Ramon, supra*, 175 Cal.App.4th 853; *Frank S., supra*, 141 Cal.App.4th 1192; *People v. Martinez* (2004) 116 Cal.App.4th 753.) They support his basic argument that a crime is not gang related or for the benefit of a gang merely because it is committed by a gang member. Otherwise, the gang enhancement would be used merely to punish gang membership. And, as the court stated in *People v. Rodriguez*, "[m]ere active and knowing participation in a criminal street gang is not a crime." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.)

22

Certainly, many courts have soundly rejected sweeping generalizations by gang experts that essentially any shooting by a gang member is gang related because the use of violence enhances the gang member's reputation, and thereby inures to the gang's benefit by instilling fear in the community untethered, as they are, to specific evidence of both prongs of the gang enhancement. (See, e.g., *Ramirez, supra*, 244 Cal.App.4th at p. 819; *Daniel C., supra*, 195 Cal.App.4th at p. 1363; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 (*Ochoa*); *Ramon, supra*, 175 Cal.App.4th at p. 853.) And a glaring absence of evidence connecting the shooting to a gang, other than the mere fact the perpetrator was a gang member, leaves the evidence woefully short of the sufficiency needed to sustain the enhancement on a gang benefit theory. Defendant contends the evidence presented to the jury, including Detective Sample's testimony, was as weak and generalized as the evidence found insufficient in many cases. For example, in *Frank S.*, a minor was charged with the possession of a knife or dagger and a small bindle of methamphetamine. (*Frank S., supra*, 141 Cal.App.4th at p. 1195.) He was also carrying a red bandana. (*Ibid*.) He was alone at the time he was stopped on his bicycle with the knife and told the police officer he had been jumped two days earlier and needed the knife for protection against " 'the Southerners.' " (*Ibid*.) During intake, he described himself as an affiliate of the Norteños. (*Ibid*.) The gang expert opined that the knife benefits the Norteños because " 'it helps provide them protection should they be assaulted by rival gang members.' " (*Id*. at p. 1199.) The court found the evidence insufficient to support the gang enhancement emphasizing the lack of gang-related evidence. "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid*.) The court rejected the notion that the gang expert's opinion that the minor harbored the specific intent to use the knife for a gang-related purpose and the knife, under these circumstances, benefited the Norteños constituted substantial evidence to support the enhancement. (*Ibid*.)

23

Similarly, in *Ochoa*, the gang expert testified the carjacking benefited the gang "by providing general transportation to the gang's members, by enabling transportation of narcotics for sale by the gang, by enabling transportation to commit further crimes by the gang, by providing economic benefit to the gang by sale of the vehicle, by elevating defendant's status within the gang, and by raising the gang's reputation in the community." (*Ochoa, supra*, 179 Cal.App.4th at p. 656.) He acknowledged, however, there was no evidence the defendant transported any gang members or claimed responsibility for the carjacking in the name of the gang. (*Ibid*.) The defendant, a self-identified member of the Moreno Trece, was alone when he approached his victim sitting in his mother's car, pointed a gun at his face, and demanded that he give him the car. (*Id*. at p. 653.) The expert's testimony, "as to how defendant's crimes would benefit Moreno Valley 13, was based solely on speculation, not evidence." (*Id*. at p. 663.)

The court found the evidence insufficient to sustain the gang enhancement. The court provides a poignant summary of what the evidence is lacking. "Defendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of defendant's tattoos. There was no evidence the crimes were committed in Moreno Valley 13 gang territory or the territory of any of its rivals. There was no evidence that the victim of the crimes was a gang member or a Moreno Valley 13 rival. Defendant did not tell anyone, as the defendant did in [*People v.* ]*Ferraez* [(2003) 112 Cal.App.4th 925], that he had special gang permission to commit the carjacking. [Citation.] Defendant was not accompanied by a fellow gang member." (*Ochoa, supra*, 179 Cal.App.4th at p. 662.)

*Daniel C.* distinguishes the sufficiency of the evidence to support the first from the second prongs of the gang enhancement. There was substantial evidence to support the first prong, that is, that the robbery was committed "in association with" (§ 186.22, subd. (b)(1)) a criminal street gang because the defendant, a gang member, was accompanied

24

by an admitted Norteño and another young affiliate of the gang. (*Daniel C., supra*, 195 Cal.App.4th at pp. 1358-1359.) They all wore red. (*Id.* at p. 1359.) But the court found the evidence was insufficient that the defendant committed his crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.* at p. 1361.) Again, the deficiency was in the gang expert's testimony.

"Here, [the gang expert] based his opinion that appellant committed the robbery to further the interests of the Norteño gang on the premise that it was a violent crime, and gangs commit violent crimes in order to gain respect and to intimidate others in their community. But, nothing in the record indicates that appellant or his companions did anything while in the supermarket to identify themselves with any gang, other than wearing clothing with red on it. No gang signs or words were used, and there was no evidence that [the assistant manager of the supermarket] or any of the other persons who witnessed the crime knew that gang members or affiliates were involved. Therefore, the crime could not have enhanced respect for the gang members or intimidated others in their community, as suggested by [the gang expert.]" (*Daniel C., supra*, 195 Cal.App.4th at p. 1363.)

These cases support defendant's central legal argument that not all crimes by gang members are gang related and the commission of those crimes do not necessarily reflect an intent to benefit the gang. We are keenly aware of the many cases in which gang experts have attributed any criminal conduct to a defendant's gang membership based on nothing more than broad generalizations. Case law is not the barrier defendant must scale. Rather, it is the contrast between the paucity of evidence presented in those cases and the quantum of evidence the prosecution introduced at defendant's trial, coupled with the limited scope of appellate review, which dooms his challenge to the sufficiency of the evidence.

As recounted in the statement of facts, there was overwhelming evidence that defendant was an active member of VFB, a subset of the Norteños, a statewide gang. He

claimed membership in "Norte Sacra." He had four dots tattooed on the knuckles of his left hand, and one dot on a knuckle of his right hand, which stands for "14", i.e., the fourteenth letter of the alphabet or "N" for Norteño. He also had "916," the area code for Sacramento, tattooed near his ear. Several police detectives testified to many encounters with defendant since 2007 during which he was wearing gang colors, possessing a gun, associating with known gang members, and displaying his gang-related tattoos.

Defendant does not challenge his personal affiliation with a criminal street gang, but he does challenge the sufficiency of the evidence that his gang has as one of its "primary activities" the commission of one or more specified crimes and that members of his gang "have engaged in a pattern of criminal gang activity." (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610-611.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

Detective Sample testified to several predicate offenses committed by members of VFB to demonstrate the requisite pattern of criminal activity. The first, occurring on August 24, 2011, involved a validated VFB member in possession of a stolen and loaded handgun while sitting in a car with two Norteños. The police also found two additional stolen and loaded handguns, multiple bags of methamphetamine and indicia of sales including cash, digital scales and cell phones. A second predicate offense occurred on July 5, 2012. Another validated Norteño VFB member attempted to hide a stolen revolver in the tire of a minivan as the police approached him. He was convicted of being a felon in possession of a firearm.

Crimes that gang members commit consistently and repeatedly constitute the primary activities of a gang. (*People v. Sengpadychith, supra*, 26 Cal.4th at p. 324.) Thus, primary activities are proven by demonstrating that individual gang members have consistently and repeatedly committed one or more of the statutorily listed crimes

(§ 186.22, subd. (e)). (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) The charged offense can also count in the tally. (*Id.* at pp. 1224-1225 & fn. 10.) In addition, a gang expert can offer an opinion about whether commission of the statutory crimes by validated gang members constitutes the primary activities of the gang. (*Sengpadychith, supra*, at p. 324.)

Based in part on the predicate offenses and in part on his personal familiarity with Sacramento gangs, Sample testified that the primary criminal activities of VFB included illegal weapons possession, weapon sales, assaults with a deadly weapon, shootings, sales of methamphetamine and cocaine, and attempted murder. Defendant complains that Sample did not further explain how any of the predicate offenses or other criminal activities related to the VFB gang or where, when, or how he knew about them. Thus, he insists the gang expert's conclusory testimony does not constitute substantial evidence that the primary activities of VFB were criminal in nature. We disagree.

The predicate offenses establish that the crimes of illegal firearm possession and use, as well as drug possession and sales, were committed by VFB gang members. Defendant did not challenge the expert's opinion at trial that the crimes listed by Detective Sample, a vetted expert on Sacramento gangs, were not the primary activities of VFB. His testimony, based on his long history and familiarity with VFB, is the type of credible evidence of solid value sufficient to sustain the jury's finding that VFB's primary activities were criminal offenses within the gang enhancement statute.

*In re Nathaniel C.* (1991) 228 Cal.App.3d 990 and *In re Alexander L., supra*, 149 Cal.App.4th 605, cited by defendant, are inapposite. Whereas in *Nathaniel C.* the expert relied on "nonspecific hearsay of a suspected shooting" about which the expert had no personal knowledge (*Nathaniel C., supra*, at pp. 1003-1004), Sample relied upon his personal knowledge of the VFB gang. Similarly, in *Alexander L.*, the expert did not testify that the criminal activities comprised the gang's primary activities, nor did he provide details or any information as to how he acquired the information. (*Alexander L.,*

*supra*, at pp. 611-612.)  By contrast, Sample testified he had worked in the Sacramento gang unit for over 10 years, he reviewed the certified records of conviction he used as predicate offenses, and he was personally involved in the investigation of the current offense.  As a result, his personal familiarity with the VFB related crimes sets him apart from his counterparts in *Nathaniel C.* and *Alexander L.*

The closer question is whether there is substantial evidence defendant specifically intended to benefit the gang when he shot at K.V. and D.S.  He argues that many salient factors were lacking.  He did not yell out a gang epithet.  The shooting did not take place in gang territory.  The victims were not members of a rival gang.  There were few people in the parking lot.  Most importantly, the encounter happened spontaneously at the mall and had all the earmarks of a combustible personal interaction between two groups of young men with fragile egos and quick tempers.

But the jury heard other compelling evidence that the shooting benefited the gang. First, defendant took the gun from another validated VFB member and shot at K.V. and D.S. in his presence.  In shooting in the presence of one of his sidekicks, he enhanced his stature and commanded his buddy's respect, two attributes exceedingly important to gang members.  Sample testified that shooting in front of other gang members was a significant benefit to the gang because the shooting enhances the reputation of the shooter in particular and inures to the gang in general.  Moreover, the charged offenses involved the use of an illegally possessed firearm and the crime of attempted murder, two of the gang's primary criminal activities.

Second, any shooting in public, according to Sample, by gang members further instills fear in the community and further ensures greater respect.  Defendant minimizes this factor because the shooting occurred in a sparsely populated parking lot rather than in the mall.  The jury was free to draw the inference defendant urges.  But the jurors were also free to accept the expert's opinion and to conclude that the shooting inured to the

28

benefit of a gang which prized violence and honored those who demonstrated their machismo with a public outburst of gunfire.

The prosecution presented the jurors with additional evidence defendant intended to benefit his gang. Sample testified that defendant, while still in the mall, made what looked like it could have been a gang sign with his hand. The image was unclear on the videotape. Nevertheless, the jurors could add the fact defendant was wearing red on his cap and his shoes, while possibly flashing a gang sign, into its calculation that the shooting was to benefit the gang.

Other factors suggest the shooting was intimately connected with quintessential gang trademarks. The encounter began with reported "eye contact" between defendant and D.S. Outside of the bizarre code of behavior attributed to gangs, mere eye contact would not trigger a shooting. But inside the gang world, eye contact takes on special significance. Sample explained to the jury that eye contact can be a sign of disrespect and can cause a situation to escalate to violence fairly rapidly. The victims made statements reflecting their awareness the shooting was gang related. And the fact D.S. refused to testify, even after he was granted immunity, is consistent with the fear that permeated the community after a gang shooting, according to Sample, and assured that some witnesses would not come forward and testify.

From all the evidence, including the gang expert's opinion, a rational juror could conclude beyond a reasonable doubt that defendant engaged in the present crimes with the specific intent to promote, further or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1).) Cumulatively, the evidence is substantial and amply supports the gang enhancement. We reject defendant's claim to the contrary.

29

# III

## *The Gang Expert*

### A.  Alleged *Sanchez* Error

After defendant was tried and convicted, the California Supreme Court halted what had become the routine practice of gang experts to testify to case-specific facts about which the expert had no independent knowledge as a basis for their opinions. (*People v. Sanchez, supra*, 63 Cal.4th at p. 670 (*Sanchez*).)  "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)  The court enunciated a clear new rule that an expert cannot slip in testimonial hearsay, based on case-specific facts.  "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code.  They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven.  They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception.  What they cannot do is present, as facts, the content of testimonial hearsay statements." (*Id*. at p. 685.)  Admission of testimonial hearsay statements violates the confrontation clause.  Defendant insists he is entitled to the benefit of *Sanchez*, Detective Sample violated his right to confrontation when offering numerous testimonial hearsay statements about the predicate offenses and jail incidents, and the trial court's error in allowing the statements was not harmless beyond a reasonable doubt.

Defendant objects to Sample's reliance on police reports and jail incidents.  The police officers who wrote the reports testified at trial and were subject to cross-examination.  As to the predicate offenses described in those reports, therefore, defendant's right to confrontation was not abridged.

The prosecution sought to impeach defendant's testimony that he had forsaken his affiliation with the gang years earlier with evidence that he was ensnarled in gang incidents in the jail. No one from the jail, however, testified to defendant's gang-related behavior in jail. We agree with defendant that Sample's testimony about the case-specific facts surrounding his conduct at the jail constituted inadmissible testimonial hearsay in violation of his Sixth Amendment right to confrontation. We disagree, however, that the error was prejudicial.

There is an abundance of evidence that defendant was a member of VFB, that he was in the company of another validated VFB member at the time of the shooting, that he was tattooed with gang indicia, that he was wearing gang clothing at the time of the shooting, and that mere "eye contact" sparked the shooting. Whether or not he had disavowed gang affiliation by the time he got to jail was rather insignificant given that it was his gang affiliation at the time of the shooting that was relevant to imposition of the gang enhancement. As a result, the case-specific statements Sample made about the jail incidents would have been of little consequence to the jurors' assessment whether the crimes were gang related and whether defendant intended to benefit the gang. We conclude the admission of his testimonial hearsay statements was harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th at pp. 698-699.)

## B. Misconduct

We need not explore the legal nuances as to whether the gang expert's testimony can be construed as prosecutorial misconduct or whether there would be some other legal pigeon-hole for misbehavior by a gang expert because there was nothing untoward about the detective's testimony that defendant might have flashed a gang sign. In fact, it was defense counsel who repeatedly backed him into a corner and instigated the testimony defendant now challenges.

31

The problem was this. D.S., one of the two victims, absolutely refused to testify. He was granted immunity and yet he refused to testify. He was held in contempt and yet he refused to testify. But he had made a statement to the police after the shooting that he saw defendant flash a gang sign. The videotape of the purported gang sign was unclear. The detective believed the statement constituted inadmissible hearsay and he avoided it. Nevertheless, defense counsel asked him several times in several different ways whether it was possible the gesture he saw on the videotape was not a gang sign and, if it was not, whether he would change his opinion that defendant committed the shooting to benefit the gang. Pressed again and again, the detective responded, "What you are asking me to do is sort of forget things that I know about the case . . . that aren't on the video that I can't necessarily talk about to the jury."

Defense counsel asked for a sidebar conference. Following a spirited debate, the trial court opined that normally an expert can "testify as to inadmissible hearsay." In fact, the trial court ruled, what Sample was relying on (D.S.'s statement about a gang sign) was admissible evidence. The court also ruled that the tenor of the question during cross-examination was to suggest that defendant did not exhibit a gang sign. The court stated that trial counsel's question "precluded [Sample] from completing his answer," since to provide a complete answer he would have had to refer to D.S.'s statement, thus impinging on defendant's right to confrontation. Defense counsel did not request, and the trial court did not give, the jury any admonition concerning the line of questioning or the detective's response.

Now, however, defendant claims Sample improperly suggested to the jury that he had information outside the evidence presented at trial which supported his conclusion that the hand gesture was a gang sign. Defendant suggests that in this way Sample was attempting to smuggle in extra-record evidence requiring us to reverse the judgment. (*People v. Bolton* (1979) 23 Cal.3d 208, 212.) Not so for three reasons.

First, since the detective carefully avoided telling the jury that D.S. had identified the gesture as a gang sign and he made clear he had not seen defendant make a gang sign if Sample believed it was, it was clear to the jury that Sample was drawing an inference from his experience with gang members.  Second, if there was any error or misconduct it was invited by defense counsel.  And third, any possible error was not prejudicial. Sample explicitly explained to the jury that even if defendant had not thrown a gang sign, he would have reached the same conclusion that the shooting was gang related and for the benefit of the gang.  One gang sign amidst all the gang-related evidence presented in this case had little, if any, significance.

## IV

### *Senate Bill No. 620 Discretion to Strike Firearm Enhancements*

In supplemental briefing, defendant asserts his case must be remanded to permit the trial court to exercise the discretion provided to it by Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1, 2).  Senate Bill No. 620 gave the trial court discretion to strike the firearm enhancements imposed against defendant under section 12022.53, subdivision (d).  (§ 12022.53, subd. (h).)  Respondent acknowledges the legislation, though enacted after defendant's conviction and sentencing, applies retroactively to defendant, but argues remand is not appropriate because the record establishes the trial court would not exercise the discretion provided.  We agree.

The court recognized this was no "ordinary" gunfight and defendant's actions posed an extraordinary risk not only to his intended target but to many innocent bystanders who, as events unfolded, were unknowingly shopping in the wrong place at the wrong time.  The court disagreed with defense counsel's "analysis in terms of the existence of mitigating factors" and noted the "risk of danger in this case was extreme." "Further, notwithstanding the fact that this may have started out as a mutual combat situation, the conduct ultimately not only posed an extreme risk of danger to participants . . . but also posed extreme risk of danger to just everyday ordinary citizens

33

who happened to be shopping in the mall that afternoon." The court noted "there were bullets sprayed in different locations, many of them ended up in parked cars" and indicated that defendant was not statutorily eligible for probation but even had he been, "probation would have been denied in light of the nature and circumstances of this particular case." Clearly, the trial court was not inclined to show any leniency and it is fanciful to suppose the court would have stricken the firearm enhancement in the interest of justice pursuant to section 1385 had it had the authority to do.

## DISPOSITION

The judgment is affirmed.


            /s/
            RAYE, P. J.


I concur:


    /s/
MURRAY, J.

34

ROBIE, J., Concurring and Dissenting.

I agree with everything the majority expertly analyzes and concludes in this opinion, except for its analysis and conclusion as it relates to Senate Bill No. 620. As to that issue, the majority concludes "the trial court was not inclined to show any leniency and it is fanciful to suppose the court would have stricken the firearm enhancement" if given the opportunity. (Maj. opn., at p. 34.) I have a fundamental disagreement with the majority's reasoning. I do not believe I or any appellate court has the wisdom to determine what the trial court would have done at a defendant's sentencing hearing if it had been aware of the full extent of its discretion under Senate Bill No. 620. "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*In re Estrada* (1965) 63 Cal.2d 740, 745.)

With the enactment of Senate Bill No. 620 following defendant's sentencing, the Legislature changed the calculus a trial judge must enter when determining whether a firearm enhancement is appropriate. Because of this change, anything the trial judge said at the time of sentencing is tainted by the policy considerations behind the law then in effect. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

After taking into account the change in policy and after hearing argument from both sides, the trial court may feel differently than when it initially sentenced defendant to the enhancements. Defendant should not be denied this opportunity. Accordingly, I

1

would remand for the trial court to exercise its informed discretion when sentencing defendant to the firearm enhancements.


　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　ROBIE, J.

2